UNITED FUEL GAS COMPANY ET AL. *v.* RAILROAD COMMISSION OF KENTUCKY ET AL.

No. 1. Argued November 28, 1927. Reargued October 15, 16, 1928.—Decided January 2, 1929.

*Mr. John W. Davis,* with whom *Messrs S. S. Willis, Harold A. Ritz, Douglas M. Moffat,* and *Edward L. Patterson* were on the brief, for appellants.

*Mr. John T. Diederich,* with whom *Messrs. Frank E. Daugherty,* Attorney General of Kentucky, *Overton S. Hogan,* Assistant Attorney General, and *Vernon A. Dinkle* were on the brief, for appellees.

MR. JUSTICE STONE delivered the opinion of the Court.

This is an appeal from a final decree of the District Court for eastern Kentucky denying an injunction restraining the appellee, the Railroad Commission of Kentucky, from establishing an alleged confiscatory rate for the sale of natural gas in the cities of Ashland, Catlettsburg, and Louisa, Kentucky, or in the alternative from preventing appellants from withdrawing their service in the sale and distribution of natural gas to consumers in those cities. 13 F. (2d) 510. The case comes here on direct appeal under § 238 of the Judicial Code, the decree of the district court having been entered before the effective date of the Jurisdictional Act of February 13, 1925.

The case was argued here with No. 4, *United Fuel Gas Co.* v. *Public Service Comm'n of W. Va.,* decided this date, *post,* p. 322, which involves some questions considered in the opinion in this case.

Appellant, United Fuel Gas Company, a West Virginia corporation, also appellant in No. 4, is engaged in the business of producing natural gas from gas fields located principally in West Virginia, which it sells to consumers in West Virginia, Kentucky and Ohio. A part of its business is the sale of gas wholesale to distributors in West Virginia, and has not been subjected to regulation by any public body. Its local business in Kentucky is subjected to regulation by appellee. It formerly held franchises for the sale and distribution of gas in the Kentucky cities named, all of which had expired by July, 1918. Nevertheless, it continued its service in those cities until June, 1923, when it organized appellant Warfield Natural Gas

Company, a Kentucky corporation, whose stock it owns and to which it conveyed its property in Kentucky and which has since carried on its business of distributing gas in the cities named. The United Company then purported to withdraw from all its business in Kentucky by cancelling appointments of agents to receive service of process within the state and by notifying the Secretary of State of its action.

Before the organization of the Warfield Company proceedings were had before the commission which resulted in its order directing a reduction of rates by the United Company to 80% of the former rate of 40 cents per 1,000 cubic feet, less 5 cents for prompt payment. Promptly on its organization the Warfield Company filed with the commission a new rate schedule for the cities named of 45 cents per 1,000 cubic feet, with a reduction of 5 cents for punctual payment, and petitioned the commission to establish this rate as fair and reasonable or, in the alternative, to permit it to withdraw its service from those cities. After an extensive hearing the commission denied the application and construed its earlier order as requiring a rate of 28 cents (80% of 35 cents).

The present suit was then brought in the district court. That court construed the order of the commission as fixing a 32 cent rate, which it upheld, and enjoined the commission from imposing any lower rate. From the latter part of the decree no appeal was taken.

The present appeal challenges the constitutionality of the order of the commission, as construed by the court, under the Fourteenth Amendment of the federal Constitution, both because the rate is confiscatory and because the order, which under the Kentucky statutes is not subject to judicial review, was not supported by findings of the commission. The validity of the order is also assailed on the further grounds that the part of it which required appellants to continue to render service violates the Ken-

tucky constitution and that the commission itself ·was never constitutionally created, and hence was without jurisdiction, because the legislative act establishing the commission and giving it its authority is in violation of § 51 of the Kentucky constitution, which provides that no legislative act shall relate to more than one subject which shall be expressed in its title.

The district court and this Court, having jurisdiction of the cause since questions are raised under the Constitution of the United States, may pass on all questions of state law involved, *Risty* v. *Chicago, Rock Island & Pacific Ry. Co.* 270 U. S. 378, 387, and must do so so far as they are necessary to a decision.

Section 163 of the Kentucky constitution provides that gas companies may not procure franchises permitting them to lay pipes in and under public streets without the consent of the appropriate municipal governing bodies and § 164 limits all franchises to periods not exceeding twenty years. Section 23 of the Statutes of Kentucky, c. 61, Acts of 1920, p. 250, subjects any public service company which has continued its service after the expiration of its franchise to the jurisdiction and authority of the Railroad Commission and forbids it to withdraw such service without permission of the commission so long as it remains in business in any part of the state. It is said that the action of the commission under this statute in effect operates as a renewal of the franchise of appellants in the cities named in a manner not in conformity with the provisions of the state constitution.

But this objection, and that as well to the constitutionality, on state grounds, of the statute creating the commission and defining its powers, are not available to appellants in the present suit. It is the rule of this Court, consistently applied, that one who has invoked action by state courts or authorities under state statutes may not later, when dissatisfied with the result, assail

their action on the theory that the statutes under which
the action was taken offend against the Constitution of
the United States. *Wall* v. *Parrot Silver & Copper Co.,*
244 U. S. 407; *Electric Co.* v. *Dow,* 166 U. S. 489; *Eustis*
v. *Bolles,* 150 U. S. 361, *Hurley* v. *Comm'n of Fisheries.*
257 U. S. 223; *St. Louis Co.* v. *Prendergast Co.,* 260 U. S.
469. Upon like principle we think that appellants who
have procured action by a state commission under a state
statute may not assail that action in a federal court of
equity on the ground that that statute, or the one creating
the commission, is void under the state constitution.
Cf. *Shepard* v. *Barron,* 194 U. S. 553. The sound dis-
cretion which controls the exercise of the extraordinary
powers of a federal court of equity should not permit
them to be exerted to relieve suitors on such a ground
from the very action of state authorities which they have
invoked.

Assuming as we do for present purposes the authority
of the commission under state law to refuse its permis-
sion to appellants to withdraw, we perceive no objection
under the federal Constitution or otherwise, to withhold-
ing it. Appellants do not seriously deny that the War-
field Company is but an agency organized by the United
Company for the purpose of carrying on its public serv-
ice business in Kentucky or that through that agency
the latter is doing business in the cities named and else-
where in the state. In these circumstances its continu-
ance in those cities is neither forbidden nor illegal. It
remained subject to state regulation, and control of it is,
by state statute, vested in the commission with state-
wide authority. If a state may require a public service
company subject to its control to make reasonable exten-
sions of its service in order to satisfy a new or increased
demand, present or anticipated, *New York & Queens Gas
Co.* v. *McCall,* 245 U. S. 345; *Woodhaven Gas Light Co.*
v. *Pub. Serv. Comm'n,* 269 U. S. 244; *Missouri Pac. Ry.*

*Co.* v. *Kansas,* 216 U. S. 262; *Wisconsin, etc., R. R. Co.* v. *Jacobson,* 179 U. S. 287; *Atlantic Coast Line* v. *N. Car. Corp'n Comm'n,* 206 U. S. 1, *Chicago & Northwestern Ry. Co.* v. *Ochs,* 249 U. S. 416, obviously the latter may be compelled to continue to use present facilities to supply an existing need so long as it continues to do business in the state.

The primary duty of a public utility is to serve on reasonable terms all those who desire the service it renders. This duty does not permit it to pick and choose and to serve only those portions of the territory which it finds most profitable, leaving the remainder to get along without the service which it alone is in a position to give. An important purpose of state supervision is to prevent such discriminations, see *New York & Queens Gas Co.* v. *McCall, supra,* at p. 351, and if a public service company may not refuse to serve a territory where the return is reasonable, or even in some circumstances where the return is inadequate but that on its total related business is sufficient, *Atlantic Coast Line* v. *N. Car. Corp'n Comm., supra* at p. 25; *Missouri Pac. Ry. Co.* v. *Kansas, supra* at p. 277, it goes without saying that it may not use its privileged position, in conjunction with the demand which it has created, as a weapon to control rates by threatening to discontinue that part of its service if it does not receive the rate demanded. The powers of the state, so far as the federal Constitution is concerned, were not exceeded by the action of the commission, in compelling appellants to continue their service in the cities named so long as they continued to do business in other parts of the state, and to there avail of the extraordinary privileges extended to public utilities.

The contentions also that the commission was not lawfully created under provisions of the state constitution, and that its order was void because not supported by findings, have the same and no greater force than the

objection that the rate is confiscatory. Suitors may not resort to a court of equity to restrain a threatened act merely because it is illegal or transcends constitutional powers. They must show that the act complained of will inflict upon them some irreparable injury. As the court below held, appellants, as public service companies, are bound by the common law, if not by statute, to render their service at reasonable rates. If the rates are not shown to be confiscatory they cannot complain that the order purporting to impose them was void for they have suffered no injury even though the order was unauthorized. Cf. *Northern Pacific R. R. Co.* v. *Dep't of Public Works,* 268 U. S. 39, 44; *Chicago, etc. Ry.* v. *Pub. Util. Comm'n,* 274 U. S. 344, 351. We are thus brought to the question, chiefly argued and decisive of the whole case, whether the rates complained of yield such a return upon the property used and useful in the public service as avoids confiscation.

Gas is sold by the United Company to the Warfield Company at the state line at 30 cents per 1,000 cubic feet, but in view of the history and intercorporate relations of the appellants it is not contended that this contract rate is of any controlling significance in determining the propriety of the rate fixed by the commission. For this purpose appellants do not deny that they, with respect to their entire property and business, may be treated as a unit, and we so treat them. They contend here, as in No. 4, that all their property used and useful in producing the gas in West Virginia and elsewhere and in transporting and distributing it to consumers in the Kentucky cities should enter into the calculation of the rate base.

Appellants, through ownership in fee and leases or contracts on a rental or royalty basis, control the production of natural gas from 814,910 acres of land. A part of this area, the so-termed "proven" territory, is at present being used in production; the remainder being

held in reserve as either " probable" or "unfavorable" sources of future production. Their principal items of property consist of the interest in this acreage, working capital, buildings, machinery, mains, pipes, compressors and other equipment used in the production and distribution of gas.

The valuations of the entire business in the two states made respectively, by the appellants and the court below as of December 31, 1923, are as follows:

Value claimed by appellants:

| | |
|---|---|
| Physical property | $22,274,274.00 |
| Gas lands, leaseholds and rights | 36,449,176.00 |
| General overhead charges | 6,357,046.00 |
| Working capital | 990,000.00 |
| Going concern value | 8,423,105.00 |
| | $74,493,601.00 |

Value as found or assumed by the court below:

| | |
|---|---|
| Physical property | $22,274,274.00 |
| Gas lands, leases and rights (book value) | 6,732,920.00 |
| Overheads | 4,009,370.00 |
| Working capital | 999,000.00 |
| Going concern value | 3,000,000.00 |
| | $37,015,564.00 |

As will be observed the difference in these estimates of value is due chiefly to the difference in value ascribed by each to the gas rights and leaseholds. Appellants, as will more fully appear, reached their claimed value by an estimate by experts of the profits to be derived from the sale, in an unregulated market, of the quantity of gas estimated to underlie the proven and probable areas. The court below found that the value of appellants' gas field did not exceed its "book cost" which it took to be $6,732,920. This figure, however, included oil production acreage amounting to $389,591—leaving $6,343,329 as the book value of the entire gas field.

Appellants contend that for the purpose of determining whether the rate is confiscatory, the regulated business in Kentucky must be separately considered and it is immaterial whether or not a fair return is being made on the entire business, a part of which is unregulated. By taking the value of that property used exclusively in this regulated business and allocating the gas fields and other property used jointly in the two classes of business, the former on the basis of the volume of gas supplied to each type of business, appellants conclude that, if their valuation of their gas rights be accepted, a composite percentage of 11% of the total value is to be allocated to the regulated business. To establish that the rate is confiscatory they accept the conclusions of the court below as to the value of all items of property except the gas lands and leases and, substituting for that item their own minimum valuation of $30,000,000, they arrive at a hypothetical rate base for their entire property of $60,282,644. The value of the 11% of this property properly allocable to the regulated business in Kentucky is thus set at $6,631,091. This valuation, on the basis of 14% return (1½% depreciation, plus 4½% amortization, which items the court below deemed liberal, plus an 8% return), would thus entitle appellants to earn $867,309, substantially more than the actual earnings of the regulated business shown to be $749,839 in 1923 at the 32 cent rate. Appellants do not seriously question the sufficiency of the allowance for depreciation or the 8% return. The 4½% allowed for amortization, calculated on the rate base, is more than sufficient to replace appellants' entire property at the end of 18 years, the estimated life of the gas field.

In assigning to their total property a value of $74,493,-601 and in concluding that the prescribed rate is confiscatory because of its effect on the regulated business alone, appellants make certain assumptions, all of which are challenged. In the view which we take, and for present

purposes only, we likewise make those assumptions without determining their validity. They are (a) that in the case as presented present reproduction value of property used and useful in the business, if ascertainable, is to be taken as the rate base; (b) that under the circumstances of this case it is not enough that the return on appellants' business as a whole is remunerative but earnings of the property used in or properly allocated to the Kentucky regulated business must be separately considered in ascertaining whether the rate is confiscatory; (c) that both proven and probable areas of appellants' gas acreage, whether shown to be presently productive or not, if ac- quired in a prudent administration of appellants' business, are to be included in the valuation for rate making purposes; (d) that depreciation and amortization are to be calculated on the basis of the present value of the property rather than upon the original cost or investment; (e) that, although entitled to earn a fair return on the present value of their gas leases, the "delay rentals" paid upon them pending drilling and development are properly chargeable to operating expense.

Making these assumptions, it is apparent that the disposition of the present question must turn, as appellants argue, principally upon the value to be assigned to the gas rights, although in certain aspects of the case a minor consideration may be the proportion of profits from the sale of gasoline extracted from the gas which should properly be included in the net earnings of the regulated business.

The burden of proving the value of property on which they are constitutionally entitled to earn a fair return rests upon the appellants and, to justify judicial interference with the action of state officers in fixing the rate assailed, must be supported by clear and convincing evidence. *Knoxville* v. *Water Co.*, 212 U. S. 1, 16. Of the total of 814,910 acres embraced in the gas field, controlled by appellants or subsidiaries, 41,969 acres are owned in

fee. The remainder is controlled by lease or contract. This acreage, although concededly well selected for purposes of economical development and avoiding loss of gas by drainage, is not in a solid block; rather it is in widely scattered areas; much of it lies adjacent to or is interspersed with gas fields controlled by others. Leases for fixed periods and so long after as gas is found in paying quantities have been obtained by appellants by payment of small bonus payments. The leases vary in their terms, but a typical lease gives the lessee the right to drill for gas for ten years, with the privilege of renewal at a fixed small annual delay rental, varying from 25 cents to $2.00 per acre, materially increased in the form either of a fixed rental or a royalty if and when production is established. They are customarily renewed from eighteen months to a year before expiration and for renewal an additional bonus is paid.

The actual cost on this basis of appellants' gas field is not shown but it appears to have been substantially less than the book value assigned to it. It was stated on the argument that these leases, not only singly but in blocks, are sold in open market, but their market price appears not to have been established.

Appellants do not accept either cost or market value as the basis of value of their gas rights. Instead they urge that their assembled holdings of gas rights are unique in that they cannot be reproduced and that their value depends largely upon their peculiar nature and situation. They rest their claim to a largely enhanced value over book value upon alternative theories supported by two classes of expert testimony. Appellants' experts, on the basis of geological and mining engineering data, and especially by ascertaining the existing rock pressure of the gas in various pools and by comparing the rate of decrease of rock pressure with the amount of gas produced from these

pools in the same period of time, arrived at an estimate of the total volume of gas underlying the proven and probable territory. The results reached by this method were checked by comparison with the actual experience in gas production from selected pools and wells. As a final outcome of these calculations it was estimated that there was underlying the 136,384 acres of proven territory and available for use 249,100,000,000 cubic feet of gas, and in the 126,208 acres of probable territory 414,600,000,000 cubic feet. With respect to the probable territory, there were no production or pressure records to aid the experts in the preparation of their estimate. In calculating the volume of gas in this area they had recourse to comparison with the nearest pools in the same geological structure. This method was characterized by the witness using it as " difficult and uncertain " and as " much less trustworthy " than that applied to the proven territory.

These calculations are supplemented by testimony that in Pittsburgh there is an unregulated market for natural gas used for industrial purposes at 35 cents per 1,000 cubic feet which would, on an estimated changing schedule of annual production, absorb in eighteen years the total estimated reserve of gas in appellants' gas field. At this price, natural gas, it was said, could compete successfully in Pittsburgh, for industrial purposes, with gas produced from soft coal at the prevailing price of $2.75 a ton at the mine. After calculating the cost of getting this gas to the market, distant 130 miles from the nearest point on appellants' mains, providing for all construction costs including the cost of plant and transmission line, the gas when marketed, it was estimated, would pay a fair return upon investment, repay taxes and investment, and leave a balance, when discounted so as to give present value, of $32,458,129. A second witness, taking 30 cents as the market price of gas in Pittsburgh and deducting trans-

portation costs, concluded that the gas in the ground is worth 5 cents per 1,000 cubic feet and arrived at a higher value, $33,155,421. To this latter estimate he added the present estimated cost of acquiring the 552,319 acres of improbable or unfavorable territory at $5.96 per acre, or $3,293,754, making a total estimated present value of appellants' gas field of $36,449,176. In this connection there is evidence, which appears to be unchallenged, that the average cost of acquiring unoperated acreage during 1921 to 1923 was 83 cents per acre and that in 1923 appellants acquired 15,184 acres at a cost of 66 cents per acre.

Appellants' second class of expert testimony is that of men experienced and interested in the production and marketing of natural gas, who purported to assign to appellants' gas field what was described on the argument as its present exchange value or the price which the property would bring if sold by a willing seller to a willing buyer. Three such witnesses testified to a present value of appellants' gas field in amounts varying from $30,000,000 to $35,000,000 and a fourth fixed the value at $45,000,000. Examination of their testimony discloses that these estimates were not based on prevailing prices for gas leases or on actual sales but, as in the case of the geological and engineering experts, upon an estimated or assumed exhaustible supply of gas available to appellants until exhausted, and upon a predictable price for natural gas in unregulated markets through a future period of about eighteen years. Common characteristics of both methods of valuation, therefore, are the estimation on uncertain bases of the volume of gas available and of the price at which it may be sold through a long future period.

A point considered below and argued here is that gas in the earth is not capable of ownership, but we assume that appellants' leases and contracts give them complete legal power of control over the gas available beneath the surface of the area embraced in the gas field, so far as it may

be brought under physical control. We assume also that the gas is now present in substantially the volume indicated and we lay to one side the speculative character of the assumption that the gas in that volume, despite its fugitive character and its possible drainage into other fields not under appellants' control, will remain available for appropriation through the eighteen or more years required to exhaust the field.

Waiving these not inconsiderable difficulties in the way of establishing value, we pass to another and more serious difficulty. In both methods of valuation, the value of property used in a business whose rates are regulated is made to depend on an assumed earning capacity, and the data relied on to establish assumed earning capacity are themselves essentially speculative—so much so as to form no trustworthy basis for the computation of value.

It is true that a part of appellants' business is not regulated at present, but it does not appear that the ultimate distribution of their product to consumers in other states will be immune from regulation either because of the interstate commerce clause, *Pennsylvania Gas Co.* v. *Public Service Comm'n*, 252 U. S. 23; *Public Utilities Comm'n* v. *Landon*, 249 U. S. 236, or for other reasons, and there can be no reasonable assumption that it will be. The unique character of appellants' control over a natural product, limited in amount, asserted here as a basis of value, the obvious necessity of securing franchises or special privileges to enable them to distribute their product to consumers under the conditions assumed, and other circumstances which subject them to regulation in Kentucky and West Virginia, make inadmissible the assumption that the price to consumers would remain unregulated elsewhere.

And in other respects the assumed earning capacity is so wanting in probative force as to require its rejection in the circumstances here disclosed. It rests on a predic-

tion, feebly made, that the estimated amount of gas will be available as required through a period of eighteen years; that natural gas so transported and used as a fuel will command a price of from 30 to 35 cents per 1,000 cubic feet through that period in a market yet to be established despite the changes wrought by invention and improved business and manufacturing methods; and a further prediction not only of what plant and equipment must be constructed and maintained to effect delivery of the gas for this period to consumers in the city of Pittsburgh but also of the cost, through a like period, of the construction, maintenance and operation of that plant and equipment. Such predictions can only be made on the basis of data which are not and cannot be known, and most of which are in the highest degree speculative. Such a process of estimating value is without any known sanction.

On the record as made, appellants have failed to present any convincing evidence of value of their gas field which would enable us to assign to it any greater value than that which they appear to have assigned to it on their books. This book value, therefore, may be accepted not as evidence of the real value of the gas field, but as an assumed value named by the appellants, which, on the evidence presented cannot reasonably be fixed at any higher figure.

We likewise find no persuasive ground for not accepting as substantially correct the amount of $30,282,644 fixed by the court below as the maximum value to be assigned to those items of appellants' property other than the gas reserve, rather than $38,044,425, appellants' outside figure for those items. But to avoid unnecessary discussion of them in detail and for present purposes, appellants' valuation of all these items may be conceded to be correct. If we restate appellants' claimed valuation of their property by substituting for their estimate of the

value of the gas rights their book value (after deduction for oil acreage) of $6,343,329, we arrive at a total assumed maximum valuation of appellants' entire property of $44,387,754. Taking 12%[1] of this total, or $5,326,530, as the largest amount which could be allocated to the Kentucky business, a return upon it of 14% (8% plus 1½% depreciation, plus 4½% amortization) would amount to $745,714, an amount less than the actual return.

Appellants' also contend that the court below erroneously included in the earnings of the regulated business the sum of $65,166, or 50% of the net proceeds of the sale of gasoline extracted, before sale, from the gas sold in the regulated business, on the ground that this amount exceeded the profits from this branch of appellants' business as reflected on their books.

In the process of extracting gasoline from natural gas, the gas flows from the field to the extraction plant, where the gasoline is taken out, the residual gas being returned to the transmission system for distribution to consumers. In the production of this gasoline, therefore, joint use is made of the gas, gas field and certain facilities of the gas company. This joint use requires a prorating of joint investment and expenses and of the return from the joint

---

[1] Various witnesses allocated to the Kentucky regulated business an amount of property used for " production " (including the gas field) varying from 7.1% to 10.49% and a percentage of property other than " production " ranging from 9.0% to 12.07%—or for the entire property as a unit, from 8.4% to 11%. No witness testified that there was a composite percentage which could be taken generally to represent the part of appellants' entire property used in the regulated business regardless of the varying values assigned to different items of property. Appellants have used this last figure, 11%, in their calculations and do not contest its validity. This percentage appears to include some property located in Kentucky but not actually used in the local regulated business. In our own computation we have, for convenience, taken 12% as the highest possible percentage applicable and as the figure most favorable to appellants.

enterprise. Formerly, appellant United Company maintained and operated its own gasoline extracting plant. The West Virginia Public Service Commission having held that 50% of the net return from the sale of gasoline should be credited to the gas business, the United Company organized a corporation, the Virginia Gasoline & Oil Company, and conveyed to it its gasoline extraction plant, receiving the stock of the new corporation in exchange. Later it turned over this stock to its own stockholders, of which there are but two, both corporations, in the same proportions in which they held stock in the United Company. It entered into a contract with this subsidiary by which it receives one-eighth of the gross profit from the gasoline extracted. The commission and the Supreme Court of West Virginia, in *City of Charleston v. Public Service Comm'n.*, 95 W. Va. 91, in which the United Company was a party, held that 50% was a fair share of the net return of the subsidiary's business attributable to appellant United Company, and this was the conclusion adopted by the court below.

We need not labor the point that a public service corporation may not make a rate confiscatory by reducing its net earnings through the device of a contract unduly favoring a subsidiary or a corporation owned by its own stockholders. Cf. *Chicago & Grand Trunk Ry. Co. v. Wellman,* 143 U. S. 339, 345. We recognize that a public service commission, under the guise of establishing a fair rate, may not usurp the functions of the company's directors and in every case substitute its judgment for theirs as to the propriety of contracts entered into by the utility; and common ownership is not of itself sufficient ground for disregarding such intercorporate agreements when it appears that, although an affiliated corporation may be receiving the larger share of the profits, the regulated company is still receiving substantial benefits from

the contract and probably could not have secured better terms elsewhere. *Southwestern Bell Telephone Co. v. Public Service Comm'n.*, 262 U. S. 276, 288; *Houston v. Southwestern Telephone Co.*, 259 U. S. 318.

But this case is not of that class. It is not without significance that the West Virginia court in considering this question had before it previous findings of its commission, based upon actual contracts for gasoline extiaction where the parties, dealing at arms length, had agreed upon a 50% division. Credible evidence was introduced below tending to show that expenses on property used jointly by the two companies and properly allocable to the gasoline company had been borne by the gas companies to an amount in excess of the return received by them from the gasoline extraction. It likewise was shown, the evidence not being challenged by appellants, that the extracting company during the years 1917 to 1922 inclusive, after allowing appellants 50% of the net earnings for the extraction privilege, would have earned not less than 102% of its capital investment in each year. The average yearly profit during this period was 119.75%. In 1923 its net return on this basis was 80.40%. Making allowance for fluctuation in market prices and other common business hazards, we do not think it would be difficult to induce capital to seek investment on the basis of this division of net earnings. In such circumstances we think no adequate reason is shown for not including in the appellants' earnings 50% of the net proceeds from the gasoline extraction.

Appellants' computation of value and of earnings is assailed at many other points, but fully conceding, for present purposes only, every contention made by them except those which we have discussed, namely, the value of appellants' gas rights and the division of return from gasoline extraction, the appellants have failed to show

that the rate imposed is confiscatory or otherwise such as to call for the interference of a court of equity.

*Affirmed.* ·

MR. JUSTICE MCREYNOLDS concurs in the result.