CITY OF CLEVELAND *v.* THE EAST OHIO GAS CO.

THE STATE, EX REL. TURNER, ATTY. GENL., *v.* EAST OHIO GAS CO.

(Decided June 17, 1929.)

*Mr. Carl F. Shuler, Mr. Henry S. Brainard, Mr. Newton D. Baker,* and *Mr. Raymond T. Jackson,* for plaintiffs.

*Messrs. Tolles, Hogsett & Ginn,* and *Mr. William B. Cockley,* for defendant.

VICKERY, P. J. These two cases, to wit, City of Cleveland v. East Ohio Gas Company and State of Ohio, ex rel., v. East Ohio Gas Company, come into this court on appeal from the Common Pleas Court of Cuyahoga county, and in each case the purpose is the same; that is, to prevent the East Ohio Gas Company, a public utility within the state of Ohio, from discontinuing its service in the city of Cleveland, and to the inhabitants thereof, without first filing an application with the state Utilities Commission and getting the commission's permission to discontinue, or its refusal to allow a discontinuance, before of its own volition terminating the service that it had theretofore been rendering to the people of Cleveland, under and by virtue of a contract between it and the city of Cleveland.

The history of the gas litigation in Cleveland is exceedingly interesting, especially to this member of

the court, who, eight years ago, in 1921, sat with his present associate Judge Sullivan, and former Judge Ingersoll, for a full month, and heard the claims of both the city and the East Ohio Gas Company. At that time the issue was mainly the inability of the gas company to supply the city of Cleveland with gas, and volumes of testimony were taken to show that the supply of gas had practically been exhausted. The evidence in that case showed that 75 per cent. of all the gas in Ohio had been exhausted, and that at least 60 per cent. of the supply in the West Virginia field, which supplied the Hope Gas Company, which in turn supplied the East Ohio Gas Company with a large share of its product for distribution, was likewise exhausted. *Then* the question was as to the rate to be charged, and for a very long period of time, as it seemed, the contention was mainly based upon the argument of the diminishing supply of gas and the inability of the gas company to furnish gas, and I think, if the record in that case is examined, the testimony of such engineers as Mr. Ubelaker of New York City, on the part of the gas company, as well as that of the state geologists of both Ohio and West Virginia, will show that it was only for a very short time indeed that any company would be able to furnish natural gas. *Now* it is admitted that the East Ohio Gas Company has the gas for sale, and that the city of Cleveland and its people need the gas, and want it, and it seems that the only difficulty is that the parties cannot agree upon the rate. It does seem as though two parties, one who has a product to sell and the other a desire to buy that product, should be able to meet upon a common ground. The gas question is too serious a one

to the people of Cleveland to be made the football of politics; the price of gas too serious a matter for anybody to make a political issue of. But, however that may be, it seems that the city of Cleveland and the East Ohio Gas Company have come to a parting of the ways, and the history of the gas question in Cleveland is, as already stated, very interesting.

In 1902, or thereabouts, when the East Ohio Gas Company first made its advent into the city of Cleveland, there were two local gas companies, the People's Gas, Light & Coke Company and the Cleveland Gas, Light & Coke Company, one serving the west side and the other serving the east side. When the East Ohio got its franchise, it soon absorbed and did away with the other two companies, and it became a monopoly, and the sole server to a large extent to the vast number of people in Cleveland of their light and fuel. When the East Ohio Gas Company absorbed and destroyed the two companies theretofore existing in Cleveland, one serving the west side of the river and the other the east side of the river, it was permitted to capitalize the value of these properties, which capitalization was taken into account in order to fix a proper rate which the East Ohio Gas Company might charge for gas in order to give a fair return to the stockholders of the East Ohio Gas Company. It became a monopoly in this line in Cleveland, and has served the people of Cleveland from that time down to the present, first, under a franchise, I think, for ten years, and then under a renewal of that franchise for another ten years at an increased rate to the consumer. That contract expired in 1921, when the litigation between the city and the gas company took place, and the decision on

that question was made by this court in October, 1921.

As a matter of fact, the city of Cleveland is not much more than a nominal party in this action; nor is the state of Ohio anything more than that. The real parties in interest are the more than 200,000 users of natural gas, and, had it not been necessary to have a franchise to lay pipes in the streets and public places of Cleveland, the gas company, if it could have got to the consumer, could have made an individual contract with each consumer; but, in order to get to the place where the gas was consumed it was necessary to have a franchise from the city of Cleveland to lay pipes in the streets and public places in the city; and, in order to insure uniformity of rates, it was proper that the city of Cleveland should make the contract for the benefit of all the people.

Now this franchise is perhaps what might be dubbed an indeterminable franchise, and the rates could, by contract, be changed at any time by a contract between the city of Cleveland and the East Ohio Gas Company for a period of perhaps not to exceed ten years.

Under Section 4, Article XVIII, of the Constitution of Ohio, municipalities in Ohio have full right and power to make contracts with respect to the operation of utilities within their confines, and under that section of the Constitution Cleveland exercised its right to make a contract.

The East Ohio Gas Company has at this time invested in the city of Cleveland somewhere between thirty-five and forty millions of dollars, and the people of Cleveland, in laying pipes into their homes and supplying the apparatus and fixtures necessary

for the use of gas, have expended probably a sum equal to that expended by the gas company, so here two parties, the public on the one side, which in this litigation is represented by the city of Cleveland, and the East Ohio Gas Company on the other side, which admits that it has the gas and is ready to supply the people of the city of Cleveland, who, of course, are anxious to be supplied, are come to a stalemate, and the matter has gotten into court.

The question to be determined in court in the present litigation—for it must be remembered that it is the intent neither to fix a rate nor to show what is a proper rate—is whether the East Ohio Gas Company can withdraw its service without first making an application to the Public Utilities Commission of Ohio for permission to discontinue such service, and whether, if the commission thought it expedient or to the best interests of all concerned to permit such discontinuation of service, it might do so.

It is admitted in this case that the East Ohio Gas Company serves at least from 25 to 50 cities and towns in the state of Ohio, and that its service to Cleveland is only a part of the service rendered. It is admitted that it does not contemplate or intend to withdraw its service from other towns which it is serving, with which it has agreed and entered into contracts. I believe the East Ohio Gas Company has entered into a contract with my own city, that of Lakewood, which is satisfactory to both sides. But it claims that it has the right to withdraw its service from the city of Cleveland without consulting the Utilities Commission, on two grounds:

First. Because the so-called Miller Act, Sections 504-2 and 504-3, General Code (108 Ohio Laws, pt.

1, 372), if it is attempted to make it apply to the Cleveland situation, is unconstitutional.

Second. The eleventh section of the contract itself provides in so many words that, at the end of the period of the contract which went into effect in 1923 for a period of five years, the gas company should have the right, nay, should be compelled, to withdraw its service and terminate its relation with the city of Cleveland; and it is therefore argued that by the terms of this contract the gas company is compelled to withdraw its service, irrespective and in spite of the Miller Act.

When the case was heard in 1921, before the Miller Act was passed upon by the Supreme Court, I had the notion that, inasmuch as the Constitution of 1851, which apparently was passed to overcome the force and ruling of the decision in the *Dartmouth College case,* a judgment which had theretofore been rendered by the Supreme Court of the United States, which in effect held that a charter granted by Charles the Second to the trustees of Dartmouth College was a contract, and that, when New Hampshire became a state in the United States of America, it acceded to all the rights and liabilities of the Colonial government, operated under the Crown of Great Britain, and so came within the inhibition of the clause of the United States Constitution, which prohibits a state from making any law impairing the obligation of a contract—I say, inasmuch as the Constitution of 1851 was in force when the gas contract was made, and in force when the Miller Law was passed in 1919, I had thought that under the police power of the United States, and under the authority granted by the Constitution of 1851, Section 2, Arti-

cle XIII, which provided that the Legislature might pass laws affecting changes in charters of corporations, the Miller Law might apply to a pre-existing contract; but the Supreme Court of Ohio, in the case of *East Ohio Gas Co.* v. *City of Cleveland,* 106 Ohio St., page 489, 140 N. E., 410, held otherwise, and I, of course, am content to follow its holding.

An examination of 106 Ohio State, *supra,* will show that the only reason why the Supreme Court of Ohio held the Miller Act not applicable was because the contract of 1911 was in force and effect before the Miller Act was passed, and, therefore, in the judgment of the court, it impaired the obligation of a contract, and was within the inhibition of the United States Constitution. But the Ohio Supreme Court clearly indicated that, if the Miller Act had been in existence at the time the contract of 1911 was entered into, it could have been invoked, holding that, so far as contracts made thereafter were concerned, they could and should be regulated by the Miller Act. Judge Robinson, in the course of the opinion, at pages 508, 509, of 106 Ohio State, 140 N. E., 416, says:

"The express purpose of these provisions of the code is that when a public utility begins 'furnishing service or facilities within the State of Ohio,' regardless of the terms of the contract under which it is operating, or under which it began such operation, its right to terminate such service is dependent upon the conclusions of the public utilities commission rather than upon the terms of the contract * * *."

Now it is interesting to notice why the Miller Act was passed. The history of legislation often throws a great deal of light upon the purpose and reason of

the Legislature. This act was passed after the Supreme Court had decided the case of *East Ohio Gas Co.* v. *City of Akron,* 81 Ohio St., 33, 90 N. E., 40, 26 L. R. A. (N. S.), 92, 18 Ann. Cas., 332, which held, in effect, that the franchise to the East Ohio Gas Company in Akron was an indeterminable franchise, and that, after the expiration of a rate contract, it could be terminated by either party; for, inasmuch as there was no Miller Act, there was no restraint upon the right of a utility to terminate the relation, nor of the city to terminate it, and that the people, on the one hand, would be put to great inconvenience, and the property of the utility might be practically destroyed, on the other hand, unless there were some method of supervising its withdrawal.

In answer to a query from this member of the court to the lawyers as to whether or not the Miller Act did not contemplate a supervision and withdrawal of service by a public utility corporation after its contract of rate had ceased, so as to minimize the damage to the public, for the contract might end in the dead of winter, when it would be extremely detrimental to the health and convenience of the public to suddenly withdraw its service, counsel for the gas company filed a very able brief pointing out that courts of *equity* always had the supervisory power under their general equity jurisdiction to supervise the governing and removal of such service by public utilities, and pointing out that in 106 Ohio State, *supra,* the Supreme Court of Ohio gave a six-month period of time in which the gas company could withdraw its service, and cited other cases where the courts have done likewise.

Counsel seem to have lost sight of the proposition

that that would be going into a court of equity to compel the granting of service after the contract had expired, thus compelling the city or some inhabitant to invoke the jurisdiction of a court of equity to oversee a winding up and a proper abandonment of the service by a public utility corporation.

Assuming that that power existed, and does still exist, is it not more consistent with the present trend of government, and the relation of utilities to the government, to have the body that was especially created for such purposes, having jurisdiction over not only one part of the state, but over the entire state, regulate the withdrawal of service by public utilities? Was not that one reason why the Miller Act was passed? Prior to that time the Utilities Commission had control over certain utilities named in the statute, and then, the Legislature's attention being called to the danger of withdrawal of service of the gas company in the *Akron case,* it extended jurisdiction of the Utilities Commission to include gas companies.

In this connection it is interesting to quote from the brief of the counsel in that case, which, by the way, was the same counsel that now represent the East Ohio Gas Company. They said in their brief, in effect, that one of the ways in which the obligations of continuing service could be imposed upon such utility was by a statute of the state specially imposing such a duty, which thereby became a part of the utility's contract either with the state or with the city, or both. That is apparently what the Legislature did, acting upon that suggestion, when it passed the Miller Act, which amended the general

utilities statute by including gas companies within its provisions.

There are certain products furnished the public, which, in their very nature, are not competitive. A monopoly is the best thing for the public, and it is upon that theory that the two gas companies existing in Cleveland when the East Ohio Gas Company got its franchise were merged into the East Ohio Gas Company. The public is best served by a public utility having the field solely to itself, and not by competition. Now, of course, with this trend of thought on public service, the public must not be left to the rapacity of utilities corporations, so that they may demand any price and get it, because then the people would be at their mercy, and consequently rate-fixing commissions, utilities commissions, that supervise, regulate and curb the rapacity of a utility that otherwise might squeeze the very lifeblood out of the people, have come into existence.

The Miller Act was in keeping with the general trend of public thought upon this question. If you recognize the monopoly, and the crowding out of all competitors, there must be some way in which the public may be protected, otherwise the people will be subject to what Justice Stone of the United States Supreme Court said, that is, they will be compelled to yield to an unconscionable contract because of their utter inability to cope with the utility which has the very necessities of life in its control and refuses to contract with the public, no matter how urgent the need, unless it can have its own price; and the utility could make that price so high that it would be inimicable to the interest of the people who were compelled to yield to its exactions.

The latest pronouncement upon this subject is found in the case of *United Fuel Gas Co.* v. *Railroad Commission of Kentucky,* 278 U. S., 300, 309, 49 S. Ct., 150, 152, 73 L. Ed., 390, from which we quote as follows:

"The primary duty of a public utility is to serve on reasonable terms all those who desire the service it renders. This duty does not permit *it to pick and choose and to serve only those portions of the territory which it finds most profitable, leaving the remainder to get along without the service which it alone is in a position to give.* An important purpose of state supervision is to prevent such discriminations, see *New York & Queens Gas Co.* v. *McCall, supra,* at page 351 [of 245 U. S., 38 S. Ct., 122, 62 L. Ed., 337], and, if a public service company may not refuse to serve a territory where the return is reasonable, or even in some circumstances where the return is inadequate but that on its total related business is sufficient, *Atlantic Coast Line* v. *N. Car. Corp. Comm., supra,* at page 25 [of 206 U. S., 27 S. Ct., 585, 51 L. Ed., 933, 11 Ann. Cas., 398]; *Missouri Pac. Ry. Co.* v. *Kansas, supra,* at page 277 [of 216 U. S., 30 S. Ct., 330, 54 L. Ed., 472], *it goes without saying that it may not use its privileged position, in conjunction with the demand which it has created, as a weapon to control rates by threatening to discontinue that part of its service if it does not receive the rate demanded.*"

Now, with this in mind, let us remember that the present contract, from which the gas company sought to withdraw without the consent of the Utilities Commission, was made in April, 1923, and the Miller Act, bringing gas companies under the pro-

visions of the utilities law of Ohio, and under the domination and control of the Utilities Commission, was passed in 1919, after the *Akron case* was decided.

Acting perhaps upon the suggestion that was contained in the brief of counsel for the East Ohio Gas Company in the *Akron case*, the Miller Law was passed, and a contract was made with reference to the products mentioned within the utilities law as amended by the Miller Act, and that statute became a part of the contract, and the East Ohio Gas Company, by continuing service after the Supreme Court decision in 106 Ohio State, *supra*, and after the adoption of the Miller Act, by entering into a new contract for a period of years at a fixed rate thereby agreed that the Miller Law should become a part of that contract, and apparently the learned counsel acting for the East Ohio Gas Company, and perhaps those acting for the city of Cleveland, conceived that this Miller Law might be a part of the contract, and so they put in the eleventh section of the contract, which is as follows:

"Section 11. The contract arising from the acceptance of this ordinance by the company shall be deemed to have been entered into upon the express condition that on April 30, 1928, this ordinance, the contract created hereby, together with all the rights of The East Ohio Gas Company, its successors and assigns, to occupy the streets, alleys, lanes, public grounds and public places of the said city, and all its obligations to supply natural gas therein, shall cease and terminate, and the company shall discontinue the supply and distribution of natural gas in said city; provided, however, that said The East

Ohio Gas Company, its successors and assigns, shall
have a reasonable time thereafter within which to re-
move its pipes, mains and other structures from the
streets, alleys, lanes, public grounds and public
places of said city; provided, however, that if the
provisions of this paragraph or any part thereof
shall be determined to be invalid by any court of last
resort, its invalidity shall not invalidate any other
section or sections of this ordinance.''

Apparently this was an attempt to evade the pro-
visions of the Miller Law, because counsel had be-
fore them not only the decision of the Supreme Court
in *East Ohio Gas Co.* v. *City of Cleveland,* 106 Ohio
St., 489, 140 N. E., 410, but also the decision in the
case of *Village of St. Clairsville* v. *Public Utilities
Commission,* 102 Ohio St., 574, at page 589, 132 N. E.,
151, 155, in which Judge Marshall, speaking for the
court, said:

''It is, however, contended on the part of the vil-
lage that those decisions no longer have any force or
effect and that the doctrines therein promulgated
have been annulled by the provisions of Section
504-3, General Code, and that since such enactment
the question of the right to withdraw service must
be submitted to the commission for determination.
*This view is undoubtedly correct,* but it is not im-
portant in the instant case because there has been
no disposition to evade the authority of the commis-
sion.''

If, then, a utilities corporation, when its contract
has expired, if it be one of those utilities named with-
in the Utilities Act after its amendment in 1919, un-
dertakes to withdraw its service, it must first make
an application to the Utilities Commission, and the

learned counsel for the gas company undoubtedly had that in mind when they put the eleventh section above quoted in their contract, and, if the Miller Law is constitutional and affects the contract in question, did the utility relieve itself against this step by inserting this clause, namely, clause 11 of its contract? In other words, if the Legislature has seen fit, under the broad power known as the police power, in order to regulate the utilities in the interest of the health, comfort, and convenience of the people, to impose certain restrictions upon the discontinuing of service of a utility, can that legislative act be defeated by a contract between the contracting parties? We think not, and we think the Supreme Court of Ohio has recently spoken upon that question.

In the case of *Southern Surety Co.* v. *Chambers,* 115 Ohio St., 434, 154 N. E., 786, 789, the Supreme Court, in affirming the Court of Appeals of the Eighth Appellate District, held that when parties made a contract in which they ignored a statute, the statute on that subject became a part of the contract, regardless of the terms and conditions written into the contract by the contracting parties. Judge Allen, in speaking for the court, cites a great many cases, many of which are extremely illuminating on the question under discussion. She cites *Verducci* v. *Casualty Co. of America,* 96 Ohio St., 260, 117 N. E., 235, and says:

"It was held by this court that the provisions of the statute giving an injured workman the right of subrogation became a part of the contract of indemnity regardless of the contract between the parties."

See, also, *National Union Fire Ins. Co.* v. *Wanberg,* 260 U. S., 71, 43 S. Ct., 32, 67 L. Ed., 136, to

the same effect, and the same doctrine is announced in *Lorando* v. *Gethro*, 228 Mass., 181, 117 N. E., 185, 1 A. L. R., 1374.

*Globe Indemnity Co.* v. *Barnes* (Tex. Civ. App.), 281 S. W., 215, holds that, where specifications of a contract for school buildings require a surety bond acceptable to school trustees, guaranteeing payment of all labor and material, a clause in the bond purporting to limit the liability of the surety to the obligee named is not effective, in view of the statutory provisions upon that subject. *Duke* v. *National Surety Co.*, 130 Wash., 276, 227 P., 2; *Fogarty* v. *Davis*, 305 Mo., 288, 264 S. W., 879; *American Surety Co. of N. Y.* v. *State, ex rel. Blade* (Tex. Civ. App.), 277 S. W., 790.

From these authorities and others that might be found, it must be perfectly clear that parties to a contract cannot take themselves from under the statute that was passed for the protection of the public by writing into such contract terms that are antagonistic to the statute itself.

Apparently the drafters of this section of the contract were a little doubtful as to its efficacy, for in the same section the contract provides in effect that, if that section of the contract is held to be invalid, it shall not affect the rest of the contract, which shall remain in force and effect; so, we think, under the decisions of Ohio, and by the general trend of authority, the Miller Act being in existence at the time the contract in 1923 was entered into, it became a part of the contract, and the gas company, or the city, either one—for it is mutually binding upon both parties—could not terminate the relation, could not discontinue service, without first making application to the

Public Utilities Commission and getting its permission, and that commission is a commission appointed to govern all utilities in the State, and it won't do to say that the East Ohio Gas Company is limited to the city of Cleveland alone. It serves, as already stated, 25 to 50 cities. It has the gas and it has its customers; it has its property in Cleveland; it surely does not wish to terminate its relation with the people of Cleveland to enter into a new field, to lay new mains, to get new customers, and to re-establish a new plant elsewhere.

Can there be any serious objection to any well-minded utility—and it must be remembered that utilities are permitted and created for the purpose of aiding and benefiting the public—can it, I say, be any hardship for the East Ohio Gas Company to file an application with the Public Utilities Commission, setting up its desire, giving notice through the commission of its desire to withdraw its service? After a hearing, if the Utilities Commission thinks the request should be granted, it has the power, under certain terms and conditions, to grant the withdrawal of service. If, on the other hand, it finds that such step is not to the best interests of the public, it can refuse the permission, and I apprehend that in such case the Utilities Commission would have the power to fix what would be a proper rate to give a fair return for the capital invested by the gas company. But it is said that to do this interferes with the power of municipalities to contract, as provided for in Section 4, Article XVIII, of the Constitution. We do not think so. This is not a *limitation* upon the *power* to contract. If the Miller Law said that a municipality could not *make* a contract with the gas

company without first getting the permission of the Utilities Commission, there might be some force to the argument that it impinged upon the right to contract and was in violation of Section 4, Article XVIII.

But no such purpose is contemplated. A contract was entered into freely between the city of Cleveland and the East Ohio Gas Company, and it lasted through the entire period of its specified duration, and now, for some reason, the city and the gas company cannot agree upon a rate, and the gas company apparently wishes to withdraw.

Is it an interference with the right to contract to say that, after the utility has entered upon service, under a contract, it cannot withdraw, after such contract has expired, without getting permission from the Utilities Commission, which has the power to appraise the property for taxation, which has the power of control over utilities? I say, can there be any hardship, can there be any argument that there is an interference with the right of contract, in having a commission provide for an orderly discontinuance of service, so as not to endanger the health and property of the inhabitants and people who use the product? And it must be remembered and always be kept in mind that the real parties in interest in this lawsuit are the 200,000 users of the gas. The city will not be discommoded; nor will the state. It will be the *people* who pay the gas company, who have piped their homes and furnished the equipment at the expense of millions, that will be damaged by the withdrawal of the service. And, when the learned counsel concede in the able brief which they have filed that a court of equity could interfere,

and would have the power to interfere with a hasty or detrimental withdrawal of service, it seems to me they concede their case away.

The legislature of Ohio, the supreme power of the state of Ohio within the Constitutions of Ohio and the United States, has put the regulation of this withdrawal of service into the hands of the Public Utilities Commission of Ohio, and the Miller Law was passed for the very purpose of having this effect. The contract between the East Ohio Gas Company and the city of Cleveland in 1923 was made with reference to that statute, and that statute became a part of the contract, and it was just as much a duty of the gas company to get the consent of the Utilities Commission to withdraw service as it was to furnish gas under the contract. It was a part of its contract, and the ineffectual effort that was made by Section 11 becomes merely nugatory.

The East Ohio Gas Company lays much stress upon the decision laid down in *Village of Oak Harbor* v. *Oak Harbor Natural Gas Co.*, 106 Ohio St., 660, 140 N. E., 943. It was a *per curiam,* and it simply based the opinion of the court upon an opinion rendered in the same volume, to wit, *East Ohio Gas Co.* v. *City of Cleveland,* 106 Ohio St., 489, 140 N. E., 410, and no one can read anything out of that case other than that the Miller Law, being in existence at the time the present contract was made, became part of that contract.

We think from this whole record, and from the authorities, that the city of Cleveland and the state of Ohio were both entitled to the relief they seek by injunction, and are entitled to a perpetual injunction to prevent the East Ohio Gas Company from with-

drawing its service from the city of Cleveland without first making an application and obtaining the consent of the Public Utilities Commission of Ohio. In other words, we think that the Miller Law is a valid exercise of the police power, and is not unconstitutional. We think it became a part of the East Ohio Gas Company's contract and it is bound by its provisions. Nor do we think that an imposition of the Miller Act interferes in the slightest degree with the right of a municipality to contract as provided for in Section 4, Article XVIII, of the Constitution, and from the whole record we can come to no other conclusion than that the injunctions should be allowed and made perpetual.

*Injunctions allowed.*

SULLIVAN and LEVINE, JJ., concur.