**MANUFACTURERS LIGHT & HEAT CO. et al. v. FEDERAL POWER COMMISSION et al.**

**No. 10981.**

United States Court of Appeals Third Circuit.

Argued June 15, 1953.

Decided Sept. 1, 1953.

Milton C. Baldridge, (Brooks E. Smith, New York City, and William Anderson, Pittsburgh, Pa., on the brief), for Manufacturers Light & Heat Co. and Home Gas Co.

Louis L. DaPra, Washington, D. C. (Willard W. Gatchell, General Counsel, Lambert McAllister, Associate General Counsel, Robert L. Russell, Sherman S. Poland, Washington, D. C., on the brief), for Federal Power Commission.

Claude B. Wagoner, Philadelphia, Pa., (McWilliams, Wagoner and Troutman, Philadelphia, Pa., on the brief), for Crystal City Gas Co.

Thomas B. K. Ringe, Philadelphia, Pa., (J. David Mann, Jr., Washington, D. C. and Frank L. Luce, Philadelphia, Pa., Morgan, Lewis & Bockius, Philadelphia, Pa., on the brief), for Bangor Gas Co., Citizens Gas Co. and Pen Argyl Gas Co.

Before MARIS, McLAUGHLIN and KALODNER, Circuit Judges.

MARIS, Circuit Judge.

The Manufacturers Light and Heat Company and Home Gas Company have petitioned this court to review and set aside an order of the Federal Power Commission on the ground that the Commission exceeded its statutory authority in directing them by the order to sell and deliver natural gas to three local gas distributing companies because to do so will impair the petitioners' ability to render adequate service to their customers. The order under attack was entered on the applications of Bangor Gas Company, Citizens Gas Company and Crystal City Gas Company, filed under Section 7(a) [1] of the Natural Gas Act. It directed Manufacturers to establish physical connection with and sell and deliver to Citizens Gas Company its requirements of natural gas not exceeding 428 Mcf per day, and to Bangor Gas Company its own requirements not exceeding 425 Mcf per day and those of its affiliate, Pen Argyl Gas Company, not exceeding 116 Mcf per day, after the proposed merger of Bangor and Pen Argyl is consummated. The order also directed Home to establish physical connection with

1. "Sec. 7. (a) Whenever the Commission, after notice and opportunity for hearing, finds such action necessary or desirable in the public interest, it may by order direct a natural-gas company to extend or improve its transportation facilities, to establish physical connection of its transportation facilities with the facilities of, and sell natural gas to, any person or municipality engaged or legally authorized to engage in the local distribution of natural or artificial gas to the public, and for such purpose to extend its transportation facilities to communities immediate-

ly adjacent to such facilities or to territory served by such natural-gas company, if the Commission finds that no undue burden will be placed upon such natural-gas company thereby: *Provided*, That the Commission shall have no authority to compel the enlargement of transportation facilities for such purposes, or to compel such natural-gas company to establish physical connection or sell natural gas when to do so would impair its ability to render adequate service to its customers." 15 U.S.C.A. § 717f (a).

and sell and deliver to Crystal City Gas Company its requirements of natural gas not exceeding 750 Mcf per day.

Applicants Citizens, Bangor and Pen Argyl are Pennsylvania public utility corporations and subsidiaries of Penn Fuel Gas, Inc. They are engaged in the sale of propane air gas of 750 Btu in the boroughs of Bangor, Roseto, Pen Argyl, Stroudsburg and East Stroudsburg, in Pennsylvania. Citizens requested the delivery of 260 Mcf per day for the peak day in 1951 increasing to 428 Mcf by 1955; Bangor requested 202 Mcf per day in 1951 increasing to 425 Mcf by 1955 for itself and for Pen Argyl 55.5 Mcf per day in 1951 increasing to 116 Mcf in 1955. Crystal City, a New York public utility corporation engaged in the distribution of natural gas in Chemung and Steuben counties, proposing to augment its present supply of natural gas and to serve areas not now being served, requested 750 Mcf per day. The total volume of natural gas thus sought for peak day delivery in 1955 is 1,-719 Mcf per day. The applications of Bangor, Citizens and Crystal City also included prayers under Section 7(c) of the Act for authority to construct laterals to connect their respective distribution systems with transmission lines of Manufacturers and Home. Pen Argyl also applied under Section 7(c) for authority to construct a lateral 8,820 feet long to connect with the distribution system of Bangor. The order under review granted these applications.

Manufacturers is engaged in the production, transportation and sale of natural gas, both at wholesale to other distributing companies and at retail to the public, in various areas in Pennsylvania which do not include those served by the present applicants. Its 14 inch Coatesville-Port Jervis transmission pipe line, however, passes within 15,825 feet of the distribution system of Bangor and within 6,336 feet of that of Citizens. Home is engaged only in the transmission and sale at wholesale of natural gas for resale and does not now serve Crystal City. Its transmission pipe line passes within 3 miles of the northern end of Crystal City's distribution system in the village of Painted Post. Manufacturers and Home are both subsidiaries of the Co-

lumbia Gas System, Inc., which sells natural gas in Kentucky, Maryland, New York, Ohio, Pennsylvania, Virginia and West Virginia, and are part of its integrated system of affiliates. The aggregate gas supply of all companies in the Columbia system is treated as a pooled supply which is apportioned between the various parts of the system by a single system dispatcher. Therefore, in determining the issues here involved, the Commission considered them against the background of Columbia's gas-supply situation and viewed the evidence offered and statements made as those of Columbia through its subsidiaries, although Columbia was not itself a party to the proceedings.

In their answers filed prior to the hearing of the Section 7(a) applications, the petitioners, Manufacturers and Home, stated that they were prepared to show their estimated gas requirements and supply situation as well as the facilities and capacities involved in making deliveries of natural gas and that they anticipated abiding by any order which the Commission might deem advisable with regard to applicants' requests. The proceedings were consolidated for hearings which were held in April 1951. While these matters were pending for initial decision, the Commission found, in analyzing the record in other proceedings in which Columbia was also involved, that Columbia's gas situation had changed. The Commission on its own motion reopened the consolidated proceedings for the limited purpose of taking additional evidence with respect to the estimated gas requirements and gas supply situation of Columbia. Columbia, through its subsidiaries the petitioners, Manufacturers and Home, then changed its position and opposed the Section 7(a) applications on the ground that it was Columbia's responsibility to meet its obligations, present and future, in the areas presently served and that it should not be required to take on any new markets at this time.

The Commission's presiding examiner rendered his decision and order on August 1, 1952. He found that it was necessary and desirable in the public interest to grant the applications. He found that the exist-

ing distribution systems of Citizens, Bangor and Pen Argyl are insufficient to render adequate artificial gas service but would be adequate for the service of natural gas; that the availability of natural gas would result in capital savings; that propane air gas is more costly to consumers than natural gas and its availability uncertain. He found that it would not place any undue burden upon Manufacturers to deliver the gas requested nor impair its ability to render adequate service to its customers, the volume of gas involved being infinitesimal in comparison with the volumes sold annually by Columbia so that it would have no calculable effect upon deliveries by Columbia to other customers. The presiding examiner also found it to be necessary and desirable in the public interest, because of the resulting economy and improvement of service, to grant the application of Crystal City and that the volume of gas involved is so small that Home's ability to render adequate service to its customers would not be impaired thereby. By the order under review entered on October 3, 1952, the Commission denied exceptions to the decision of its presiding examiner and adopted and put into effect his decision and order with slight modifications not pertinent here.

The petitioners allege that in so doing the Commission exceeded its statutory authority under Section 7(a). They rely upon the proviso in that section that "the Commission shall have no authority * * to compel such natural-gas company to establish physical connection or sell natural gas when to do so would impair its ability to render adequate service to its customers." The Commission's findings that no undue burden will be placed upon petitioners by rendering the required service and that no enlargement of facilities will result thereby are not disputed. The petitioners' attack is centered upon the Commission's determination that the sale of 1,719 Mcf per day of natural gas to the applicants will not result in the impairment of petitioners' ability to render adequate service to their customers. The petitioners contend that the sale by them of some part, however

small, of their supply of gas to new communities will, under existing conditions, impair to the extent of such sale their ability to serve their customers, since Columbia's gas supply, which is already inadequate, would thereby be further reduced. In support of this proposition they assert that Columbia's gas supply is deficient to meet the full requirements of its customers.

What constitutes impairment of a natural-gas company's ability to render adequate service to its customers is not defined in the Act. Congress, therefore, committed to the Commission the determination, by application of its informed judgment upon the pertinent facts and circumstances presented by each case, whether such an impairment would result. Here the Commission has found that no such impairment will result from its order. We think that this finding has ample support in the record. The deficiencies which Columbia asserts result almost wholly from the fact that it does not have a sufficient supply of natural gas to fill all the demands of prospective consumers in the thickly populated and highly industrialized area which it serves. This is an existing condition which is not the result of the order here under attack and which will not be appreciably aggravated by it. For the petitioners do not dispute the Commission's finding that the volume of gas here involved is so small, when compared to Columbia's or even the petitioners' requirements, as to be negligible and without ascertainable effect on their ability to render service to their customers and that the delivery of this volume of gas would not cause any measurable or cognizable impairment thereof.

The petitioners have not shown that the delivery of the volume of gas called for by the Commission's order will alter their situation to any appreciable degree. Moreover the only actual deficiencies which the Columbia system has experienced in meeting the lawful demands of their customers have been on days of peak demand in extreme winter weather. The evidence indicates that on these days it is customary for Columbia to curtail deliveries to industrial

consumers in order to assure the necessary gas for domestic and space heating purposes. If such industrial curtailments were not practiced it would be necessary to withhold service throughout the year from many consumers badly needing gas in order to have a sufficient supply of gas available to meet the entire demand for all domestic, space heating and industrial uses on the comparatively few coldest days of the winter when the demand for gas is at the peak. We think it not unreasonable for the Commission to conclude that such curtailed service to industrial consumers on the coldest days is "adequate service" within the meaning of Section 7(a).[2] Accordingly we cannot say that the Commission erred in finding that the sale of gas required by its order would not result in an impairment of the ability of the petitioners to render adequate service to their customers, within the meaning of Section 7(a).

■ The petitioners assert that the Commission may not direct them to serve any new customers so long as Columbia's gas supply situation leaves doubtful its ability to deliver to all of its customers not only the full volumes which they now desire but also those which they may desire in the future. Their premise is that they cannot be forced to deliver natural gas to new markets when the areas which they now serve are not fully satisfied. Petitioners contend that Congress, in using in the proviso in Section 7(a) the phrase "adequate service to its customers", intended that a gas company must be permitted to serve the full requirements of the communities it is presently serving before being required to serve customers in other communities. We cannot agree that this is the intent of the Act. The petitioners cite United Fuel Gas Co. v. R. R. Comm., 1929, 278 U.S. 300, 49 S.Ct. 150, 73 L.Ed. 390, for the proposition that the basic duty of a public utility is to serve the requirements of customers in the communities it is undertaking to serve, whether the customers have already been attached or are applying for service. However, in that case the Supreme Court also said 278 U.S. at page 309, 49 S.Ct. at page 152:

> "The primary duty of a public utility is to serve on reasonable terms all those who desire the service it renders. This duty does not permit it to pick and choose and to serve only those portions of the territory which it finds most profitable, leaving the remainder to get along without the service which it alone is in a position to give."

Under Section 7(a) of the Natural Gas Act this primary duty extends also to those situated in "communities immediately adjacent to such facilities", such as the applicants here.[3] Moreover the proviso of Section 7(a) refers to present customers, not to future customers or to communi-

---

2. Compare Atlantic Coast Line v. Wharton, 1907, 207 U.S. 328, at page 335, 28 S.Ct. 121, 123, 52 L.Ed. 230, in which Justice Peckham said:

   "The term 'adequate or reasonable facilities' is not in its nature capable of exact definition. It is a relative expression, and has to be considered as calling for such facilities as might be fairly demanded, regard being had, among other things, to the size of the place, the extent of the demand for transportation, the cost of furnishing the additional accommodations asked for, and to all other facts which would have a bearing upon the question of convenience and cost."

3. The Congressional intent in this regard was revealed in the debates. Thus Representative Cole of Maryland stated:

   "I remind the House of this fact. When we pass this bill without any apparent opposition, the people of this country demanding it, it will affect not only the great cities where gas is consumed, but the little fellow in my State back through the rural sections in whom I am interested, where these pipe lines have been running for years, and perform no service to the people along them. They are under no regulation whatever. After this bill is passed, I think the rural sections having given the rights away to these lines feeding the great metropolitan sections of the country, will find through the machinery of this law a medium of relief so that service will come to them." 81 Cong.Rec. 6724.

ties.[4] The petitioners' contention in this regard is accordingly without merit.

The order of the Commission will be affirmed.

4. In House Report No. 709, 75th Cong., 1st Sess., on H.R. 6586, which became the Natural Gas Act, it was stated that Section 7(a) "does not give the Commission authority to compel such extension or establishment of physical connection when to do so would impair the ability of the natural-gas company to ren-

der adequate service to its *existing* customers." p. 5. [Emphasis supplied].