## SIGNAL GASOLINE CORPORATION v. COMMISSIONER OF INTERNAL REVENUE.

### No. 7035.

Circuit Court of Appeals, Ninth Circuit.

Sept. 6, 1933.

Melvin D. Wilson, of Los Angeles, Cal. (Miller & Chevalier, of Washington, D. C., and Joseph D. Peeler, of Los Angeles, Cal., of counsel), for petitioner.

Sewall Key, Andrew D. Sharpe, and John MacC. Hudson, Sp. Assts. to Atty. Gen. (C. M. Charest, Gen. Counsel, and J. A. Lyons, Sp. Atty., Bureau of Internal Revenue, both of Washington, D. C., of counsel), for respondent.

Before WILBUR, SAWTELLE, and GARRECHT, Circuit Judges.

GARRECHT, Circuit Judge.

Petitioner acting through its statutory trustees brings this petition to review a decision of the Board of Tax Appeals, determining deficiencies in its income taxes for the years 1925 and 1926.

The material facts are not in dispute, and the only question presented to this court is whether or not petitioner is entitled to depletion [1] deduction for the years 1925 and 1926 in respect to gross income derived by it in connection with casing-head gas taken from oil and gas wells under written and oral contracts commonly called casing-head gas contracts. The applicable statute is the Revenue Act of 1926, c. 27, 44 Stat. 9, 14, 42.[2]

---

[1] For a discussion of the theory of depletion allowance, see United States v. Ludey, 274 U. S. 295, 47 S. Ct. 608, 71 L. Ed. 1054.

[2] Section 234. "(a) In computing the net income of a corporation subject to the tax imposed by section 981 [230] of this title there shall be allowed as deductions: * * *

"(8) In the case of mines, oil and gas wells, other natural deposits, and timber, a reasonable allowance for depletion and for depreciation of improvements, according to the peculiar conditions in each case; such reasonable allowance in all cases to be made under rules and regulations to be prescribed by the commissioner with the approval of the Secretary. In the case of leases the deductions allowed by this paragraph shall be equitably apportioned between the lessor and lessee." 26 USCA § 986 (a) (8).

Section 204. "(c) The basis upon which depletion,

Petitioner, in May 1924, acquired, approximately fifty-one casing-head gas contracts, being a portion of the assets of two gasoline companies, and were acquired subject to all their respective outstanding obligations and liabilities. The total of these liabilities is not given, but they were in excess of $50,000. The purchase price of the assets was $107,488.41 cash and 450,000 shares of petitioner's common stock of a par value of $1 per share. What the assets consisted of, other than the contracts in question, does not appear from the record. The record does show, however, from testimony introduced by petitioner, that "casing-head gas contracts have a very great value."

During the years of 1925 and 1926, and prior to its dissolution, petitioner acquired casing-head gas, under these contracts, from certain oil wells in the state of California. While the contracts in question are not identical, the difference in terms and phraseology are not important in the present issue. Each contract follows the same general form and creates similar benefits and obligations.

The following are material excerpts taken from a typical contract as set out in the opinion of the Board:

"Whereas said party of the first part is the lessee of certain property * * * particularly described as follows, to-wit, * * * and has developed and is developing and intends to further develop said property for oil and gas by drilling thereon * * *

"Whereas said second party * * * desires to purchase and receive from said first party, all of the natural gas which may be produced from its above described property for the purpose of manufacturing and extracting gasoline therefrom * * *

"Now, therefore, in consideration of the mutual covenants herein contained and other good and valuable consideration, receipt of which is hereby reciprocally acknowledged, the parties hereto hereby covenant and agree to and with each other as follows, to-wit:

"1. The said party of the first part hereby leases and agrees to furnish and deliver to said party of the second part, for the purpose of extracting gasoline therefrom, all of the gas produced by it from the above described property, for and during the entire period of time it shall produce gas therefrom, the said party of the second part having and being hereby given the sole and exclusive right to treat all gas produced by said party of the first part as aforesaid. * * *

"2. Said party of the second part agrees to erect, equip and put into operation a plant. * * * When said plant is completed and ready to commence operations, said party of the first part agrees to commence the delivery of the gas being produced from the above described property, into the lines of the second party; said lines being carried to each producing well of the party of the first part on said property, by and at the expense of the party of the second part. * * *

"3. In full consideration of the rights herein granted, said party of the second part agrees to pay to said party of the first part (here follows provisions for the payment of royalty by party of the second part to the party of the first part, which are not identical in all of the contracts, some providing that a percentage of the gross proceeds shall be the portion of the party of the first part for which the second party agrees to pay at a certain price. In other contracts the well operator was given the option of receiving its royalty in kind). * * *

"6. After said gas has been treated by said party of the second part and the gasoline content extracted therefrom, the remaining dry gas shall belong to and be the property of the party of the first part; the party of the second part having, however, the right to use free of charge such of said gas as is necessary for fuel in his aforesaid operations. * * *

"7. Party of the second part shall have the right to lay necessary pipe lines upon and across the property of the party of the first part, subject to lease or leases affecting said property, and at all times shall have full right of ingress and egress.

"8. Said party of the first part shall provide and maintain all necessary and proper equipment and facilities for separating the oil and gas produced on said premises in order to save and render available all of said gas for the aforesaid treatment by said party of the second part, and said party of the second part shall have the right to inspect such equipment at all reasonable times. * * *

---

exhaustion, wear and tear, and obsolescence are to be allowed in respect of any property shall be the same as is provided in subdivision (a) or (b) for the purpose of determining the gain or loss upon the sale or other disposition of such property, except that— * * *

"(2) In the case of oil and gas wells the allowance for depletion shall be 27½ per centum of the gross income from the property during the taxable year. Such allowance shall not exceed 50 per centum of the net income of the taxpayer (computed without allowance for depletion) from the property, except that in no case shall the depletion allowance be less than it would be if computed without reference to this paragraph." 26 USCA § 935 (c) (2).

"10. Party of the second part shall provide and maintain such apparatus as shall be necessary to meter or measure the quantity of gas produced from said property, and returned to said property.

"11. This agreement shall be binding upon and inure to the benefit of the heirs, executors, administrators, successors, and assigns of the party of the first part, and to the heirs, administrators, executors and assigns of the party of the second part."

In addition to the foregoing, there was included in practically all of the contracts a provision which required the party of the second part, whenever it became feasible and advisable, to install a vacuum upon the wells; that it would install the necessary equipment and maintain such vacuum as was desired by the party of the first part, together with provisions for regulating the pressure to be exerted in the operation.

The casing-head gasoline plant called for in the contracts was constructed by the Signal Gasoline Company and was included in the assets acquired by petitioner from that company.

Petitioner claims that it has the right to and does produce wet (casing-head) gas from the wells or property, and that this right amounts to such an economic and legal interest in the wells or the property as to entitle it to depletion allowance.

Petitioner contends that these contracts are equivalent to assignment or sublease, and gives it the right to enter upon the premises described and extract a natural resource therefrom, and that thus it had an interest giving rise to a depletion allowance under the Revenue Act; that this interest is not in essence materially different from the oil and gas owner's or lessee's interest, concededly a depletable interest; that its interest in the natural resources and in the property is in the nature of a profit a prendre.

Respondent denies these propositions and insists that the contracts are merely agreements of purchase and sale of the casing-head gas after production, and that petitioner has no interest in the property for which a depletion allowance can be made; in other words, that petitioner was a mere purchaser of gas which another person had extracted from the well.

The question for determination is, Has petitioner such rights in the gas produced from the properties which amount to the necessary economic interest to entitle it to depletion under the law?

■ To properly apply the provisions of the statute to the controversy here before the court, it is necessary, not only to consider the language of the contracts, but also the testimony, showing what the parties actually did thereunder as relevant in determining what interest, if any, petitioner had in the premises.

■ It is a well-established rule that, where a contract is entered into on a subject-matter concerning which known usages prevail, these are by implication incorporated into the agreement, if nothing is said to the contrary.

In general, the procedure under the contract was as follows: New wells, for a time, usually flowed oil and wet gas of their own accord. This spontaneous flow occurred periodically in a large percentage of the wells. After a well had ceased flowing in commercial quantities from the natural pressure, it was necessary, in the case of most of the wells, for petitioner to take direct means by the introduction of high-pressure dry gas into the well to induce a larger flow of oil and gas. This process was known as the "gas lift" and resulted in the production of more wet gas. If this method had not been used, a large amount of gas would never have been extracted from the oil and gas bearing sands. This gas lift process was applied to twelve wells in 1925 and twelve wells in 1926.

When the gas lift proved ineffective, the petitioner would then, by its compressors, create a vacuum within the wet gas line and throughout the well. Nearly all of the contracts expressly provide for the use of this vacuum by the petitioner. The use of this method was not confined to wells where the contract contained the provision for its use, but was also applied to other wells. This vacuum extraction of oil and gas greatly increased the output of the wells, and the petitioner and oil producer both profited materially thereby.

At times the use of the vacuum method would result in satisfactory production of additional wet gas for petitioner's use, but not sufficient oil to justify the oil producer in pumping it, except at intervals. Under such circumstances the petitioner would be the only person drawing the natural resources from the well, and in the case of each well, after it ceased to produce sufficient oil to warrant the operation of an oil pump, the petitioner became the sole operator of the well and would continue to extract casing-head gas for its own and the producer's or lessee's benefit by means of the vacuum maintained by the petitioner,

even after the well no longer yielded oil in commercial quantities. The petitioner exerted the vacuum process on the oil and gas formation on forty wells during the years in question.

During the same years, petitioner also extracted wet gas from the wells by means of a so-called "rodless pump," installed at the bottom of the well and driven by dry gas which petitioner furnished under pressure to the pump in the bottom of the well.

The petitioner also produced wet gas by the repressuring method, in which one well, surrounded by several others, was chosen as the input or "key well."

The petitioner assisted in drilling wells by furnishing separators, casing, derricks, boilers, other drilling equipment on the outcome of the well, and received no payment, if the well was dry.

The operations of the oil producers were not always sufficient to produce a commercial supply of casing-head gas for the benefit of the petitioner without effort by the petitioner in the direction of casing-head gas production, so that the oil producers and the petitioner were both engaged in continuous steps to win oil and casing-head gas from their position in the earth.

By the contracts there was imposed upon the petitioner the obligation to enter upon the premises, erect and maintain equipment thereon, attach its equipment to the casing head of the well, and exert forces which would bring the oil and gas up out of the ground.

The petitioner paid a very valuable consideration for these contracts, giving it the right to acquire the gas, and in addition expended a great deal of money in building and maintaining its plants and wet and dry gas lines, and its vacuum and gas pumps, needed to carry out its contracts and the practices customary in the casing-head gasoline business.

There was considerable discussion in the briefs and upon the argument as to whether this established an interest in the land amounting to a profit a prendre. There are some differences of opinion found in the authorities as to the proper application of the underlying principle of the right in question.

The courts of some of the states have held rights, as here involved, to be a profit a prendre.

Considered by themselves, the contracts may not specifically convey any title to gas in the ground, but the contracts confer upon petitioner the right to enter upon the land and connect its pipes directly with the oil wells, install meters, and petitioner is required to maintain vacuums on the oil wells. These provisions, together with the method of operation sanctioned by the parties whereby petitioner, by means of gas lifts, rodless pumps, and the use of compressors to create vacuums, extracted the gas that would otherwise not be produced from the premises, conferred upon it an incorporeal right to be exercised in the land in relation to the gas which was in the nature of a grant of a profit a prendre.

If petitioner, by these contracts and the methods employed in reducing the wet gas to possession, acquired an interest in the gas in place or a right to share in the gas produced, it then had the requisite economic interest which under the statute entitled it to reasonable allowances for depletion, and it matters not under what particular designation the right may be classified.

The evidence makes it clear that when wells were drilled down to the sand just a small part of the gas in place rose so that it could be caught in the casing head. This would amount to such an insignificant quantity as would not have justified the erection of a plant to reduce it. The installing of this extensive plant and the other appliances for the recapture of the casing-head gas, the language of many of the contracts wherein petitioner covenanted to connect its vacuum pump and bound itself to apply sufficient pull to get its share of all gas in that vicinity, taken in connection with the methods employed by the parties, make the conclusion inevitable that the petitioner was to have an interest, not only in such gas as might naturally rise and be caught in the casing heads, but that this right extended to all the gas that petitioner might be able to reduce to possession by drawing it to the surface and into its plant.

The issue in the case before us, we think, is settled by the opinion in the case of Palmer v. Bender, 287 U. S. 551, 53 S. Ct. 225, 227, 77 L. Ed. 489.

In that decision the court pointed out that the statute here involved permits a reasonable depletion allowance to be made "in the case of oil and gas wells * * * according to the peculiar conditions in each case"; that there is nothing in the statute or regulations to confine a depletion allowance to persons who are technical lessors; and that the concluding sentence of the section, to the effect that, in the case of leases, deductions shall be equitably apportioned between lessor and lessee, indicates that depletion deductions may be allowed in other cases. The court expressed the

890

opinion that the language of the statute is broad enough to permit a depletion allowance in every case where a taxpayer had acquired, by investment, any interest in the oil in place, and acquires, by any form of legal relationship, income derived from the extraction of the oil, to which the taxpayer must look for a return of his capital. The court also stated that the right to a depletion allowance does not depend upon the retention of ownership or special form of legal interest in the mineral content of the land, but upon his right to share in the oil produced. In short, the court made it clear that the lessor, lessee, or any other person having or acquiring an interest in the oil in place or a right to share in the oil produced, has such an economic interest in the oil that he is entitled to a depletion allowance.

Accordingly, the right to a depletion allowance does not depend upon the nature or character of the legal estate retained or acquired by the parties to an original oil and gas lease or their successors, but depends entirely upon whether any such parties are entitled to share in the oil and gas produced from the properties. If any of such parties are entitled to a share of the oil and gas, he had the "economic interest" upon which the Supreme Court bases the right to a depletion allowance.

Applying the principle as established by the Supreme Court, it seems clear that the interest of petitioner was included within the meaning of the statute, permitting deduction of a reasonable allowance for depletion, according to the peculiar conditions in this case.

The decision of the Board of Tax Appeals is reversed.