**HURLEY v. UNITED STATES.**

No. 1856.

District Court, N. D. Oklahoma.

Jan. 14, 1935.

George E. H. Goodner, of Washington, D. C., and E. M. Gallaher, of Tulsa, Okl., for plaintiff.

Chester A. Brewer, Asst. U. S. Atty., of Tulsa, Okl., for the United States.

**McDERMOTT, Circuit Judge.**

This is an action at law to recover $16,527.42 income taxes for the years 1920, 1921 and 1922. In the original returns for those years the plaintiff took certain deductions for depletion, which the Commissioner disallowed upon an audit, and assessed a corresponding deficiency. The tax as assessed was paid in installments, the last two installments being paid on April 6, 1929, in the amount of $5,383.27, and on April 10, 1929, in the amount of $1,040.89. Whereupon a seasonable claim for refund was made, and seasonably denied, and this suit follows.

By an amended answer, and also by an objection to the introduction of any evidence, the defendant raises the question of the statute of limitations.

The applicable statute (R. S. § 3226, amended, 26 USCA § 156), provides that "no such suit or proceeding shall be begun * * * after the expiration of five years from the date of the payment of such tax, penalty, or sum, unless such suit or proceeding is begun within two years after the disallowance of the part of such claim to which such suit or proceeding relates." The plaintiff concedes that this statute bars recovery except for the two payments made in 1929, which were made within five years from the date the suit was filed. The government contends that the suit must be brought not only within five years from the date of the payment of the tax, but also within two years after the claim for refund is denied. The statute does not so read. The statute gives five years after the payment of the tax for the bringing of such suits as these in any case, and further provides that suits may be brought after the expiration of the five year period, if within two years from the disallowance of the claim. I conclude, therefore, that the statute of limitations is no bar to a recovery of the sums paid in 1929, which was within five years of the date of the filing of this suit on October 5, 1933.

The facts are not seriously in dispute. One J. W. Hurley came to Oklahoma from California in 1919 with the idea of making some contracts for the purchase of casing-head gas, and the construction of a casing-head gasoline plant for the purpose of recovering the gasoline from the gas. He spent several months time in looking over the field, and in negotiating contracts for such casing-head gas. Later on his brother, who was in the casing-head gasoline business, came on from California, and spent some time in a similar investigation. After an investigation of the field, and tests of the casing-head gas available, both for quality and amount, six contracts were acquired from large oil producing companies, by the general terms of which Hurley agreed to take their casing-head gas, transport it to a casing-head gasoline plant, there recover the casing-head gasoline, and return the dry or residue gas to the lease for the use of the oil lessee. In the manufacture of casing-head gasoline large compressors are constructed at the gasoline plant, which are connected with the mouth of the oil well, which serve the double purpose of transporting the gas from the wells to the gasoline plant, and of increasing the production of oil and casing-head gas by the vacuum method. Where the oil well producing the casing-head gas was located at a considerable distance from the central compressing plant, it was necessary to set up a booster station, with compression power, to transport the gas.

After these contracts were negotiated, but before all of them were executed, Mr. Hurley and his brother interested others, and among them cash to the amount of $93,000.00 was raised for the purpose of constructing a casing-head gasoline plant and laying the necessary lines to and from the wells. Before the plant was completely constructed and all of the contracts executed, and in July, 1920, it was decided to incorporate, and the partially constructed plant, with the gas contracts, and some money left in the hands of the associates, was turned over to the new corporation, and stock was issued to the associates representing their previous interests.

Neither Mr. Hurley, nor his associates, paid anything to the oil companies with whom they made these contracts for casing-head gas. The corporation issued 7500 shares of non par stock to the associates for the plant, the money turned over, and the contracts. Stock was not issued for the contracts as a separate transaction. The plant, the contracts, some money, and some bills receivable were turned over for the 7500 shares of stock. The evidence does not show the value of the time, or the expense involved, in negotiating the contracts.

The determination by the Commissioner that the corporation was not entitled to any deduction for depletion is prima facie correct, and the burden is upon plaintiff to overcome his finding. The statute in force

during the taxable years in question is section 234 (a) (9) of the Revenue Act of 1921 (42 Stat. 254, 256) and the corresponding provision in the 1918 act (40 Stat. 1078). It reads as follows:

"That in computing the net income of a corporation subject to the tax imposed by section 230 there shall be allowed as deductions: * * *

"(9) In the case of mines, oil and gas wells, other natural deposits, and timber, a reasonable allowance for depletion and for depreciation of improvements, according to the peculiar conditions in each case, based upon cost, including cost of development not otherwise deducted."

■ There is no question here involved as to an allowance for the depreciation of the casing-head gasoline plant. The sole question involved is whether the plaintiff is entitled to a deduction for depletion of the gas reserves from which the oil companies had agreed to sell it gas. Any allowance for depletion is a matter of grace, and unless Congress has provided for depletion, there can be no deduction therefor. Darby-Lynde Co. v. Commissioner (C. C. A. 10) 51 F.(2d) 32. In order to come within the quoted section the plaintiff's business must fall within the category of "mines, oil and gas wells." The plaintiff was operating a plant designed to extract gasoline from gas; it was not operating a mine, nor an oil or gas well. It is true that, as incidental to the transportation of the gas from the well to the casing-head plant, the compressor served to increase the production of oil and gas from the wells owned by the oil lessees, but in no other sense can it be said that the plaintiff was operating a gas well; it did not own a gas well; it had no interest in the lease, nor in the gas reserves, save and except that if the gas reserves became exhausted it would be necessary for it to find another gas supply, if it was to operate its plant. It seems to me that this situation is closely analogous to that of an oil refinery, which is constructed for the purpose of refining crude oil. It buys the crude oil from others, but the ordinary refinery could hardly claim a right to depletion because the fields from which it was purchasing its oil were being exhausted, and thus in an indirect way jeopardizing its investment in the refinery. By the same token, it seems to me, the plaintiff, as the operator of the casing-head gas plant, is not entitled to a depletion because of the exhaustion of gas reserves which belong to another.

■ In determining who is entitled to depletion, the courts do not concern themselves with niceties of legal title, but bring within the statute those who have any interest in the minerals "in place"; that is, a right to share in the minerals produced and an economic interest in the minerals "in place." Palmer v. Bender, 287 U. S. 551, 53 S. Ct. 225, 77 L. Ed. 489; Reynolds, Collector v. Cooper (C. C. A. 10) 64 F.(2d) 644, affirmed, 291 U. S. 192, 54 S. Ct. 356, 78 L. Ed. 725. In these cases, the taxpayer had an interest in the minerals "in place"—as lessor, lessee, or the assignee of some interest in the lease, and the court was particular twice to limit its holding to oil "in place." One who buys the oil at the mouth of the well owns the oil, but has no interest in it "in place." A pipe line carrier, a refiner, has an economic interest in the life of the fields they serve, in that their investment becomes junk when the fields play out. But no case has been found where a pipe line company or an oil refinery has been allowed a credit for depletion of the fields from which they buy their oil. So here; the taxpayer buys gas as it is produced; he has no interest in the gas "in place." It may also be pointed out that any allowance for depletion to a manufacturer must either be deducted from the allowance to the lessor or lessee, or the depletion will run more than 100 per cent. I do not believe the statute contemplates any such allowance.

However, the Commissioner ruled otherwise during the years in controversy. Art. 223 of the applicable Regulations (45 and 62) reads in part:

"Casing-head gas contracts have been construed to be tangible assets and their cost may be added to the capital account returnable through depletion, following the rate set by the oil wells from which the gas is derived, or, if the life of the contract is shorter than the reasonable expectation of the life of the wells furnishing the gas, the capital invested in the contract may be written off through yearly allowances equitably distributed over the life of the contract."

This regulation was dropped in 1926. Counsel relies upon Signal Gasoline Corp. v. Commissioner (C. C. A. 9) 66 F.(2d) 886, which may be distinguished on the facts, since in that case the taxpayer pumped gas after the wells ceased producing oil, a condition not here present. Here, the vacuum pressure which increased recovery was incidental to the transportation of the gas. The sole authority for this decision is Palm-

er v. Bender, but the court overlooked entirely the qualifying words "in place" twice used in that opinion. Some early decisions of the Board of Tax Appeals are cited, but the Board later decided to the contrary, as disclosed by the Signal Case, supra. Two other cases cited, Pugh v. Commissioner (C. C. A. 5) 49 F.(2d) 76, and Alexander v. Continental Petroleum Co. (C. C. A. 10) 63 F.(2d) 927, have no bearing, for each involves an interest in minerals in place.

If necessary, I would be strongly inclined to hold that the Commissioner has no power to allow depletion to manufacturing plants where Congress limited it to "mines, oil and gas wells," for by so doing, he must take depletion from the owner of the minerals in place and give it to a manufacturer, or allow more than 100 per cent of the reserves to be recovered through depletion.

■ But it is not necessary to hold the regulation invalid, for the unsatisfactory proof of cost of the contracts—which was the basis of depletion under these statutes—is not sufficient to overturn the finding of the Commissioner. In a case involving the question of whether reserve steel was a part of current inventory or of plant equipment, the Supreme Court held that the Court of Appeals could not overturn the Commissioner's finding except upon clear and cogent proof, saying in conclusion:

"The company's case falls far short of meeting the heavy burden of proving that the Commissioner's action was plainly arbitrary." Lucas v. Kansas City Structural Steel Co., 281 U. S. 264, 271, 50 S. Ct. 263, 266, 74 L. Ed. 848.

It will serve no useful purpose to detail the evidence. After hearing the witnesses, I concluded that the oil companies selling the gas had made a good bargain, as had the plaintiff; that plaintiff had not, by superior powers of negotiation, talked the able managers of these great oil companies out of contracts of great value without any consideration. It is true that one oil lease would not justify the construction of a casing-head gas plant or an oil refinery, but that contracts from many leases would. But that does not give to contracts to buy oil or gas a large cash value. One expert for plaintiff testified that the contracts were worth from nothing to $100 a gallon of daily capacity less the cost of the plant, which amounts to no evidence. Another expert had not even read the contracts. Another built up a value based on estimates of reserves multi-

plied by an estimated value of natural gasoline—found later to be erroneous—less an estimated cost of manufacture, discounted by 50 per cent as a margin of safety. If this prophecy had been half-way correct, plaintiff would not be in the hands of a receiver. Such wizardry with figures is of value in a stock-selling campaign, but is too hypothetical to support court decrees. In United Fuel Gas Co. v. Railroad Commission, 278 U. S. 300, 317, 49 S. Ct. 150, 73 L. Ed. 390, such conjectures as to the value of gas reserves were rejected, and cost was taken as value instead. See, also, Wichita Gas Co. v. Public Service Commission (D. C.) 2 F. Supp. 792. The only satisfactory evidence here of the value of these contracts is their cost, which was nothing. I therefore find the fact to be that these contracts had no fair market value when the corporation acquired them.

If the taxpayer were the associates who incorporated, it would be apparent that no depletion would be allowable. The argument is that since they incorporated, their corporation paid a price for the contracts, to wit, its stock. If the Standard Oil Company issues stock with a market value for property, it has paid an ascertainable price. And there are occasions, such as noticed in O'Meara v. Commissioner (C. C. A. 10) 34 F.(2d) 390, and Champlin v. Commissioner (C. C. A. 10) 71 F.(2d) 23, where the value of the property transferred may be resorted to in order to fix the value of the stock. But here neither the stock nor the property transferred had a market value. Nor does this record disclose how much stock was issued for these contracts. All the record discloses is that 7500 shares of stock were issued for the plant, contracts, accounts receivable, and money. Plaintiff undertakes to cover this gap by proving that an established casing-head gas plant, as a going concern, has a market value of somewhere between $50.00 and $100.00 a gallon of daily capacity; from that value the plaintiff then subtracts the cost of the plant, the value of the bills receivable, and the cash, and says that the balance represents the cost to the corporation of these contracts.

■ But there is no need of such roundabout methods of arriving at the value of contracts acquired practically contemporaneously with the transfer to the corporation. Cost in the market, arrived at by negotiation between able business men familiar with values and not compelled to buy or sell, is excellent evidence of value. That cost

was nothing except the time spent in negotiating them.

The truth about this case, as I get it, is this: The contracts negotiated by plaintiff with the capable business men representing the oil companies, retained to the oil companies such a large royalty, and put upon plaintiff such burdensome conditions of operation, that the contracts when made were fair to both parties, but were worth just what they cost, and that is nothing. If a refinery entered into contracts to buy crude oil from leases adjoining the refinery at the prevailing market price of crude oil, the contracts have a value in the sense that they enable the refinery to run, but it could not fairly be said that the contracts had a fair market value.

In any event the evidence is not at all of that character or probative force which would justify the court in overturning the deliberate judgment of the Commissioner on this question of fact.

There is still another reason which to my mind bars recovery. Section 203 (b) (4) of the Revenue Act of 1924, 26 USCA § 934 (b) (4) provided that where a group of persons incorporated their holdings, no taxable gain shall arise from the transaction, and under that act clearly there would be no cost to the corporation arising from such a transaction. Darby-Lynde Co. v. Commissioner (C. C. A. 10) 51 F.(2d) 32. That section of the 1924 act does not appear in the earlier acts. However, in O'Meara v. Commissioner, supra, our court held there was no taxable gain under the 1921 act where a group of associates incorporated their interests in property. The O'Meara Case parallels this one on its facts. A group of associates incorporated for convenience. There is no proof here, as there was none in the O'Meara Case, of any market value of the stock when issued. The value of the properties transferred in both instances was speculative.

Our Court of Appeals held, in both the O'Meara and the Champlin Cases, that the incorporation gave rise to no taxable gain. Clearly in this case, too, no taxable gain arose, and it is not intimated that any taxable gain was returned by the associates. It seems to me to be essentially fair to hold that no taxable deduction can arise from a transaction which can give rise to no taxable gain.

Judgment will be entered for defendant for costs.