## BANKLINE OIL CO. v. COMMISSIONER OF INTERNAL REVENUE.

### No. 8294.

Circuit Court of Appeals, Ninth Circuit.

June 7, 1937.

A. L. Weil and Martin J. Weil, both of San Francisco, Cal., for petitioner.

Robert H. Jackson, Asst. U. S. Atty. Gen., and Sewall Key, John G. Remey, and Warren Wattles, Sp. Assts. to Atty. Gen., for respondent.

Before WILBUR, MATHEWS, and HANEY, Circuit Judges.

WILBUR, Circuit Judge.

This is a petition for the review of decisions of the United States Board of Tax Appeals entered March 24, 1936, and March 28, 1936, determining a deficiency in petitioner's income taxes of $5,108.71 for the year 1927, of which $3,592.88 has been paid leaving a deficiency of $1,515.83, and a deficiency of $846.94 for the year 1930, of which $825.33 has been paid leaving a deficiency of $21.61, and that there was an overpayment of $65.59 for the year 1928. Petitioner contends that the Board of Tax Appeals should have reduced the deficiency for 1927 by the sum of $2,713.50 and should have determined that there was an overpayment for the year 1928 of $3,598.04 and for the year 1930 of $18,828.04. Petitioner seeks exemption during the taxable year 1930 of all income derived from tide lands situated in the county of Santa Barbara, Cal., which were leased to petitioner[1] by the state of California for the purpose of producing oil and gas therefrom. Petitioner also claims that the Board erroneously refused to allow it deductions for the years 1927, 1928, and 1930 to which it was entitled because of depletion on its "casinghead gasoline contracts."

As to petitioner's first claim of exemption based upon its income derived from state tide lands:

The state of California holds the tide lands within its boundaries in its sovereign capacity in trust "for the people of the state

[1] By "lease No. 89," the state of California on October 22, 1929, leased the property in question to J. H. Barneson, vice president and director of petitioner, who acted as agents for petitioner. On November 14th Barneson and his wife assigned all their interest in the lease to petitioner, and on December 19, 1929, the assignment was approved by the state of California.

that they may enjoy the navigation of the waters, carry on commerce over them and have the liberty of fishing therein free from interference of private parties." Boone v. Kingsbury, 206 Cal. 148, 183, 273 P. 797, 812. See Constitution of California, art. 15; Illinois Central R. R. Co. v. Illinois, 146 U.S. 387, 13 S.Ct. 110, 36 L.Ed. 1018, see also, Rose's U. S. Notes; Borax, Consolidated v. Los Angeles, 296 U.S. 10, 56 S.Ct. 23, 80 L.Ed. 9; Heckman v. Swett, 99 Cal. 303, 33 P. 1099; Oakland v. Buteau, 219 Cal. 745, 29 P.(2d) 177. The petitioner's lease was granted pursuant to Statutes of California, 1921, c. 303, p. 404, entitled, "An act to reserve all minerals in state lands," etc. By this act, the state has reserved the mineral deposits in all lands belonging to the state except lands acquired on a sale for delinquent taxes, unless the deed is required to be filed in the surveyor general's office.

The statute provides for the issuance of prospecting permits (§ 4). Section 5 of the act, provides that a permittee upon establishing to the satisfaction of the surveyor general that valuable deposits of oil or gas have been discovered within the limits of the land covered by the permit shall be entitled to a lease for one-fourth of the land embraced in the prospecting permit, provided that the permittee shall be granted a lease for as much as 160 acres. It is provided that "such lease shall be for a term of twenty years upon a royalty of five per centum in amount or value of the production and the annual payment in advance of a rental of one dollar per acre, the rental paid for any one year to be credited against the royalties as they accrue for that year."

Section 6 of the act (St.1921, p. 407) provides: "Until the permittee shall apply for lease to the one quarter of the permit area * * * he shall pay to the State of California twenty per centum of the gross value of all oil or gas secured by him from the lands embraced within his permit."

Section 8 of the act provides for the leasing of unappropriated deposits of oil or gas within the known geologic structure of a producing oil or gas field to the highest bidder, the leases "to be conditioned upon the payment by the lessee of such bonus as may be accepted and of such royalty as may be fixed in the lease, which shall not be less than twelve and one-half per centum in amount or value of the production, and the payment in advance of a rental of not less than one dollar per acre per annum thereafter during the continuance of the lease, the rental paid for any one year to be credited against the royalties as they accrue for that year."

Section 19 provides: "All moneys received by the surveyor general under the provisions of this act from rents, fees, bonuses and royalties accruing from the use of state school land shall be paid into the 'school fund,' all other moneys received under the provisions of this act shall be deposited in the 'general fund.'"

One of the purposes of the aforesaid act (Cal.St.1921, c. 303, p. 404, supra) is to give to the citizens of the state of California "an opportunity to intercept the large volumes of oil gravitating seaward to inextricable depths, and to reduce to useful purposes oil, gas and mineral deposits reposing beneath the ocean's bed." Boone v. Kingsbury, 206 Cal. 148, 181, 273 P. 797, 811, supra. It was enacted in pursuance of the policy of the state of California "with respect to the extraction of its minerals from state lands." Boone v. Kingsbury, 206 Cal. 148, at page 185, 273 P. 797, 813, supra. The legislation was upheld by the California Supreme Court against the claim that it violated the implied trust under which the state holds its tide lands because the rights granted by the leases do not interfere with such trust, and do not impair the power of succeeding Legislatures to "regulate, protect, improve, or develop the public rights of navigation and fishing." Boone v. Kingsbury, 206 Cal. 148, at page 183, 273 P. 797, 813, supra.

The federal income tax is not levied on the land so held in trust, nor upon the income of the state derived from the lease of the lands. We are unable to distinguish the situation here from the principle announced by the Supreme Court in Burnet v. Jergins Trust, 288 U.S. 508, 53 S.Ct. 439, 441, 77 L.Ed. 925, where it, in a case involving a tax upon the income derived by a lessee from city owned oil lands held that "the subject of the tax is so remote from any governmental function as to render the effect of the exaction inconsiderable as respect the activities of the city." Mr. Justice Roberts, speaking for the Supreme Court, said:

"The revenue acts do not discriminate between the respondent [lessee] and others similarly situated, in the imposition of the income tax. If the respondent is exempt

from the exaction, the conclusion must follow, because the tax directly burdens the functions of the state acting through the city of Long Beach. Considerations which have led to the condemnation of taxes in other circumstances are here absent. The levy is not upon the property of the municipality, nor upon the income it derives from its property, is not upon the city's share of the oil recovered, the lease, or the gross income therefrom. The law measures the assessment by the net income of the respondent, whose operations are carried on in a private, and not in a public, capacity for the personal gain of its cestuis que trust."

See, also, Group No. 1 Oil Corporation v. Bass, 283 U.S. 279, 51 S.Ct. 432, 75 L. Ed. 1032.

Petitioner contends that the decision of the Supreme Court in Burnet v. Jergins Trust, supra, is inapplicable to the case at bar because the lands which were the subject-matter of the oil and gas lease in that case had been acquired by the city for the purpose of securing a water supply, and that in operating waterworks for its inhabitants a city is not exercising its governmental functions. But in Brush v. Commissioner of Internal Revenue, 57 S.Ct. 495, 500, 81 L.Ed. ——, decided by the Supreme Court March 15, 1937, the Supreme Court held that "the acquisition and distribution of a supply of water for the needs of the the modern city involve the exercise of essential governmental functions."

On the argument the petitioner attempted to distinguish the situation in the case at bar from that involved in Burnet v. Jergins Trust, supra, on the ground that there the court was dealing with the functions of a municipality of the state while here the state executed the lease in question. This distinction does not seem to be recognized by the authorities which hold that the city, while exercising its governmental functions, is exercising a part of the sovereign power of the state. If so, there can be no distinction in principle between such functions as exercised by the city and by the state. It has been held by the Supreme Court that where the state operates in a proprietary rather than in a governmental capacity its activities are subject to taxation by the federal government. South Carolina v. United States, 199 U.S. 437, 26 S.Ct. 110, 50 L.Ed. 261, 4 Ann.Cas. 737. It has recently been held in United States v. California, 297 U.S. 175, 56 S.Ct. 421, 80 L.Ed. 567, that where a state is operating in its proprietary, rather than its governmental, capacity it can be penalized by the federal government for violation of federal statute.

We do not place our decision upon the proposition that the state in extracting oil from lands held by it by virtue of sovereignty is acting in a proprietary capacity, particularly where the revenue derived therefrom is utilized in carrying on the governmental functions of the state. The general fund of the state "consists of moneys received into the treasury and not specially appropriated to any other fund." Cal. Political Code § 454. Moneys are disbursed from this fund for public purposes in pursuance of appropriations made by the state Legislature. We do not undertake to say whether or not the state is acting in a governmental or proprietary capacity in thus utilizing its state lands. What we do hold is that the tenant who had procured a lease upon such lands for his own profit is liable to taxation upon the net income which he derives therefrom, notwithstanding the fact that his tax liability may tend in some degree to reduce the sum which would otherwise be paid to the state as consideration for the lease. We held to the contrary in Jergins Trust v. Com'r, 61 F.(2d) 92, relying upon decisions by the Supreme Court in Burnet v. Coronado Oil & Gas Co., 285 U.S. 393, 52 S.Ct. 443, 76 L.Ed. 815; Gillespie v. Oklahoma, 257 U.S. 501, 42 S.Ct. 171, 66 L.Ed. 338; Group No. 1 Oil Corporation v. Bass, 283 U.S. 279, 51 S.Ct. 432, 75 L. Ed. 1032. That decision was reversed by the Supreme Court. Burnet v. A. T. Jergins Trust, 288 U.S. 508, 53 S.Ct. 439, 77 L.Ed. 925. The cases which we then cited are now presented by the petitioner in support of its contention that its income derived from the lease of state owned lands is not taxable. We think this case may be distinguished from Burnet v. Coronado Oil & Gas Co., 285. U.S. 393, 52 S.Ct. 443, 76 L.Ed. 815, supra, on the ground that in that case the land and the oil content thereof had been dedicated by the federal government for school purposes and that the lessee of this land was in effect an agent of the state in applying the proceeds derived from such land to school purposes while in the case at bar there is no restriction upon the right of the state to the use of the moneys derived from the oil lands.

Petitioner's second contention is that it is entitled to an allowance for depletion on

its "casinghead gasoline contracts"[2] under the provisions of sections 234, subd. (a)(8), 204, subd. (c)(2), of the Revenue Act of 1926 (44 Stat. 41, 16), and similar provisions contained in the Revenue Act of 1928 (§§ 23(*l*), 114(b)(3), 45 Stat. 799, 821, 26 U.S. C.A. §§ 23 note, 114 note).

Petitioner is entitled to a depletion allowance regardless of the technical ownership of the wet gas in place or of the particular legal designation of its interest if by its contracts it obtained an "economic interest" in the gas in place. Palmer v. Bender, 287 U.S. 551, 53 S.Ct. 225, 77 L.Ed. 489; Helvering v. Falk, 291 U.S. 183, 54 S.Ct. 353, 78 L.Ed. 719; Lynch v. Alworth-Stephens Co., 267 U.S. 364, 45 S.Ct. 274, 69 L.Ed. 660; United States v. Biwabik Mining Co., 247 U.S. 116, 38 S.Ct. 462, 62 L.Ed. 1017; Signal Gasoline Corporation v. Com'r (C.C.A.) 66 F.(2d) 886; Obispo Oil Co. v. Welch, 85 F.(2d) 860 decided by this court September 28, 1936.

The rights of petitioner under the "casinghead contracts" on which it seeks a depletion allowance are substantially the same in all the contracts. In these contracts it was provided that petitioner was entitled to receive for the purpose of extracting gasoline therefrom all the gas produced (with exceptions in some contracts) on the properties of the producers covered by the agreement. The producers agreed to deliver the gas at casingheads or gas traps installed by them on their premises. Petitioner agreed to furnish, install, and maintain all pipe lines and connections from the casingheads or gas traps to its plant, and to pay the producers 33⅓ per cent. of the total gross proceeds derived from the sale of gasoline extracted from wet gas or at the producer's option, 33⅓ per cent. of the gasoline extracted. It was agreed that after the use by petitioner of as much dry gas as it might require for plant operations, and after deductions for waste, not to exceed certain percentages of the gas the producers were entitled to the remaining dry gas.

In Signal Gasoline Corporation, v. Com'r, 66 F.(2d) 886, supra, we held that the taxpayer who had a right to wet gas produced under contracts similar to those in the case at bar had an economic interest in the oil in place entitling it to a depletion allowance. Respondent contends that the contracts in the case at bar are distinguishable from those involved in Signal Gasoline Corporation v. Com'r, supra; that in that case there was valuable consideration given for the contracts whereas in the case at bar no consideration was given for the contracts. He claims that in Signal Gasoline Corporation v. Com'r, supra, there were provisions in the contracts there involved requiring the taxpayer to participate in the production of the gas while in the case at bar the petitioner incurred no obligations in connection with the production of the gas and the production was always controlled by the producer.

The ultimate question to be determined, however, is whether the taxpayer claiming a depletion allowance has an "economic interest" in the oil or gas in place in the properties. It has such an interest if it is entitled to a part of the oil or gas produced from the properties as a part of its capital. Palmer v. Bender, supra; Helvering v. Falk, supra; Signal Gasoline Corporation v. Com'r, supra, 66 F.(2d) 886, at page 890; Obispo Oil Co. v. Welch, supra.

In the majority opinion the Board concluded that the taxpayer in the instant case had no depletable interest in the gas in place. In distinguishing the instant case from the Signal Gasoline Corporation v. Com'r (C. C.A.) 66 F.(2d) 886, it said:

"The court there was convinced that the contracts under consideration and the 'methods employed in reducing the wet gas to possession' created 'an interest in the gas in place or a right to share in the gas produced.' It concluded that the petitioner has the 'requisite economic interest which under the statute entitled it to reasonable allowances for depletion.' We are not so convinced."

This was too narrow a view of what constitutes an economic interest in the oil and gas. Three members of the Board concurred in the result upon the ground that "petitioner has failed to show that the value of wet gas at the mouth of the well purchased under casinghead gasoline contracts was in

[2] One contract was made by petitioner June 9, 1922, with General Petroleum Corporation.

Three of these contracts were entered into by petitioner on October 25, 1923, with the United Oil Company, one on May 22, 1925, with the Superior Oil Company, and one on October 9, 1928, with the Richfield Oil Company, and are entirely distinct from the state tide land leases considered above.

excess of the royalties paid therefor and therefore has not shown any proper basis for depletion deductions. Signal Gasoline Corporation v. Com'r, 30 B.T.A. 568, affirmed (C.C.A. 9th Cir.) 77 F.(2d) 728; Lomita Gasoline Co. v. Com'r, 33 B.T.A. 385. * * * Petitioner's failure of proof to show what amount of depletion deductions, if any, it is entitled to take, appears to be similar to that in the cases above cited."

We have heretofore considered the extent of the depletable base of a taxpayer in an oil and gas well. In pursuance of our decision in Signal Gasoline Corporation v. Com'r, 66 F.(2d) 886, the Board of Tax Appeals, 30 B.T.A. 568, in carrying out the mandate of this court, held that for the purpose of determining the depletion allowance the gross income from the oil property of the manufacturer who produced gasoline from wet gas was the difference between the market value of the wet gas delivered to it less the amount the manufacturer had agreed to pay for it. In dealing with that subject the Board of Tax Appeals said:

"It is well established that a taxpayer may not claim the benefit of a deduction which the statute grants to another. Dalton v. Bowers, 287 U.S. 404 [53 S.Ct. 205, 77 L.Ed. 389]; Burnet v. Clark, 287 U.S. 410 [53 S.Ct. 207, 77 L.Ed. 397]; Burnet v. Commonwealth Improvement Co., 287 U.S. 415 [53 S.Ct. 198, 77 L.Ed. 399]. It follows that the gross income of the lessee from the same production, if any, must be the excess of the fair market value of the wet gas as and when received, over the royalties which it pays under its contracts. * * *

"If the fair market value of wet gas when received by the lessee is not greater than the royalties which it pays, there is no income of any kind from its property in the leases and, consequently, no gross income that can be used as a basis for computing depletion. In the circumstances herein the petitioner must show that when received by it the wet gas had a fair market value in excess of royalties paid to the lessors. This it has failed to do, and in the absence of such showing we must assume that the fair market value of the wet gas was not in excess of the royalties paid."

This decision correctly states the rule. It was affirmed in Signal Gasoline Corporation v. Com'r (C.C.A.) 77 F.(2d) 728.

Petitioner offered evidence showing that in the tax years in question, the prevailing rate of royalties paid by other refiners of wet gas was higher than that paid by petitioner under its contracts. J. Lee Cross, for over twenty years in the business of making contracts for gasoline and leases with landowners, testified that the prevailing rates of royalty paid on the gasoline extracted from wet gas by casinghead companies in 1927 was 45 per cent., in 1928 47½ per cent., and in 1930 50 per cent. T. L. Taggart, contract superintendent of the Standard Gasoline Company whose duty with that company was to make gas processing contracts, testified that the royalty paid in 1927 was 43 per cent., in 1928 45 per cent., and in 1930 47 per cent. John McFarland, in charge of the contract department of the Gilmore Oil Company, testified that the royalty paid in 1927 was 45 per cent., in 1928 50 per cent., and in 1930 50 per cent. F. K. Baxter, witness for respondent, and engineer revenue agent with the Internal Revenue Bureau, testified:

"There is no question but the royalty rate increased from 1923 to 1928. In 1923 there were more at 33⅓% than there were at less than 33⅓%. That was the usual rate in 1923—33⅓%. Gradually the rate has increased, as has been testified to here, and up to 37½% and 40 to 45 and up to 50."

Respondent contends in his brief, however, that "a rise in royalty rates does not establish the value of petitioner's wet gas at the mouth of the well, and certainly does not prove that the value of the interest acquired exceeded what petitioner had to pay for it," that "in proving comparatives it must be shown that the basis of comparison is the same"; that petitioner failed to put in evidence any of the contracts of any other producers in the same field which contracts might have contained provisions different from petitioner's and justifying the refiner in paying a higher rate of royalty. Respondent contends, for example, that the contracts used for comparison may have contained no provision for the return of dry gas to the producer. He further contends that petitioner "failed to prove that the prevailing rates were upon wells producing the same gasoline content as the wells in petitioner's contracts," that the royalty rate would be higher on a well producing gas of a high gasoline content, than on one producing gas of a low gasoline content.

In establishing a rise in the market price of wet gas, petitioner was forced to rely on prevailing royalty rates under contracts

similar to the contracts in the case at bar for it is clear from the record that in California wet gas is not sold for a price per unit at the mouth of the well. It is apparent from the testimony that the contracts used as a basis of comparison by the witnesses who testified to the rise in the prevailing royalty may be sufficiently similar to petitioner's contracts to make their testimony a fair criterion by which to determine whether petitioner under its contracts had a right to gas below its market value.

J. Lee Cross testified:

"I know about the operation of a casinghead gas plant, and I made contracts similar to those involved in this case.

"It is not a fact that there are two general types of contracts. The gasoline company acts the same under all contracts, and assumes all contracts are as one. While firms may have worded them differently, they are operated on exactly the same by all absorption plants. I have worked for pretty nearly half of the absorption plants. I make no distinction in a contract providing for the purchase and sale of gas, and one merely providing for the treatment of it; they are all processing contracts. * * *

"Generally the contracts provide that after the extraction of the gasoline, the dry gas is returned to the producer. * * *

"I am familiar with the general type of casinghead gas contracts entered into for extraction of gasoline in which the owner of the casinghead plant goes to an operator and says that he would treat his gas for so much royalty."

The testimony of respondent's witness F. K. Baxter is not substantially different from that of Cross. He testified:

"I am familiar with the types of casinghead contracts used by the various operators. There are several types of those contracts. When I say type, I mean changes in wording. There is one type which says that the producer agrees to sell and the casinghead man agreed to buy. The other merely provides for the treatment of gas. * * *

"In some of the contracts with which I am familiar, the dry gas belongs to the casinghead contractor, while in other cases it belongs to the producer, and is sold under his instructions. * * *

"In my experience I found two broad types of contract—the gas treatment and the purchase and sale contract. The casinghead man accounts to the operator of the well for the dry gas sold. * * *

"It is usually provided that a substantial part of the dry gas, between 66% and 75%, remains the property of the producer. * * *"

As we have pointed out, the testimony of this witness as well as that of witnesses for petitioner, was that there was a rise in the royalty rates in the years in question. The inference from this testimony is that the contracts upon which they based their conclusion were substantially the same.

As to respondent's contention that the royalty rate paid on a well that produced more gasoline per cubic feet of gas would be higher than on one producing less, it is sufficient to say that there is testimony to the contrary. J. Lee Cross testified on that subject as follows:

"It makes no difference whether the gas is rich or lean, whether you have a half gallon or four or five gallons. The royalty rate is just the same.

"Ninety to ninety-five per cent of the extraction contracts are made before the wells are brought in."

In considering the decision of the Board of Tax Appeals under review, the contention of the taxpayer may be more succinctly shown by reference to the amounts it claims for depletion. We quote from its brief in that regard as follows:

"* * * if petitioner's contentions are correct, it is entitled to an allowance for depletion computed in the following manner:

| | Value of Gasoline Recovered | Contract Royalty | Prevailing Royalty | Depletable Interest | Depletion |
|---|---|---|---|---|---|
| 1927 | 626,494.68 | 208,831.67 | 281,922.61 | 73,090.93 | 20,100.00 |
| 1928 | 769,633.55 | 256,544.33 | 365.575.94 | 109,031.61 | 29,983.69 |
| 1930 | 390,596.48 | 130,257.68 | 195,298.24 | 65,040.56 | 17,886.15 |
| | | | | $247,163.11 | 67,969.84." |

■ In the foregoing statement the petitioner assumes that the evidence has established the values stated as "prevailing royalty" and that such "prevailing royalty" was the market value of the wet gas delivered to it, and that its "depletable interest" amounts in all to $247,163.11 for the three years 1927, 1928, and 1929, which represents the difference between the royalty it had agreed to pay under its contracts referred to as "contract royalty" and the market value of wet gas as established by the "prevailing royalty." The method of establishing values is a fact-finding and not a mathematical process. The Board of Tax Appeals was not obliged to accept the testimony as to the "prevailing royalties" as conclusive evidence of market value. The process of arriving at market value is a judicial process and requires that in weighing the evidence the credibility of witnesses should be considered and that in determining market value there should be an independent exercise of judgment as to value. It is true that the majority of the Board found that wet gas "as it flows from the earth is not a salable commodity." It does not follow, however, that it does not have a market value because it is invariably purchased by manufacturing concerns under royalty agreements for the production of casinghead gasoline, although it is not sold at a price per unit.

■ If, for the purpose of determining the taxpayer's gross income from the property, we attempt to fix the difference between the market value of the wet gas and the contract value thereof, we would invade the fact-finding jurisdiction of the Board of Tax Appeals. It is clear that a majority of the Board bases its decision against the taxpayer in part at least upon the ground that the nature of the taxpayer's contract is such that it would not be entitled to depletion, regardless of the question of whether or not its contract is so favorable that there was or may have been a difference between the price paid for wet gas in terms of gasoline and its market value. In this regard we think the majority of the Board erred, and that in the case at bar, having to deal with the contract under which the taxpayer was entitled to all the wet gas produced from the wells so long as any was produced, it should have ascertained whether or not it had any economic interest in the gas in place, and if so the amount of depletion to be allowed.

■ As we have pointed out, the evidence in the case all tends to show that by reason of the change in royalty rates the petitioner had a definite economic interest in the oil in place upon which it was entitled to an allowance for depletion. The extent of that right and the depletion allowance thereon is a question of fact to be determined by the Board of Tax Appeals upon the evidence before it.

· In fixing the depletion allowance, it is not sufficient to establish the taxpayer's gross income from the property and estimate the depletion allowance at 27½ per cent. thereof. It is necessary also for the taxpayer to show that this percentage does not exceed one-half of the net income from the property, unless the taxpayer claims a greater allowance for depletion than one-half of the net income in which event he must establish that it would be more if computed without reference to the two percentages above mentioned. Paragraph 2, of section 204(c) of the Revenue Act of 1926, 44 Stat. 16. The record herein does not clearly show that the taxpayer offered evidence as to the net income from the property. It apparently assumed that there was no expense of the taxpayer incident to the production of the wet gas received by it and that the net income and the gross income from the property were identical. The figures it uses in claiming depletion allowance above set forth would so indicate. As this deficiency in the proof was not the basis of the decision by the Board of Tax Appeals, we feel that the taxpayer should be accorded the right to supplement its proof on that subject and that the Board of Tax Appeals should make such an allowance for depletion as in its judgment is in accord with the evidence under the law as herein decided.

The decision of the Board is affirmed as to the nonexemption of the income of the petitioner derived from leases of petitioner on state owned tide lands, and reversed as to the disallowance for depletion on its casinghead gasoline contracts with instructions to allow additional evidence as to depletion, and to fix the allowance in accordance herewith. ·

HANEY, Circuit Judge.

I concur in that portion of the opinion prepared by Judge WILBUR which affirms a portion of the Board's decision.

I concur in reversal, but I express a substantial doubt that "wet gas," with respect to which the Board found "as it flows from the ground is not a salable commodity," can have a market value.