COMMISSIONER OF INTERNAL REVE-
NUE v. O'DONNELL.

No. 8186.

Circuit Court of Appeals, Ninth Circuit.
June 14, 1937.

Robert H. Jackson, Asst. Atty. Gen., and
J. Louis Monarch, Francis I. Howley, and

A. F. Prescott, Sp. Assts. to Atty. Gen., for petitioner.

Thomas R. Dempsey and A. Calder Mackay, both of Los Angeles, Cal. (Howard W. Reynolds, of Los Angeles, Cal., of counsel), for respondent.

Before WILBUR, MATHEWS, and HANEY, Circuit Judges.

MATHEWS, Circuit Judge.

Upon auditing respondent's income tax returns for 1925, 1926, 1927, 1928, and 1929, the Commissioner of Internal Revenue determined that there were deficiencies in the respective amounts of $505.59, $3,966.54, $7,003.28, $5,392.81, and $979.41, and so notified respondent. Respondent petitioned the Board of Tax Appeals for redetermination of the alleged deficiencies. The Board decided that, instead of deficiencies, there were overpayments of respondent's income tax for 1925, 1926, and 1927 in the respective amounts of $2,950.44, $800.35, and $3,003.28; that for 1928 there was a deficiency of $30 only; and that for 1929 there was neither a deficiency nor an overpayment. The Commissioner seeks reversal of the Board's decision.

Facts found by the Board and not disputed by the Commissioner are as follows:

On and prior to January 9, 1918, respondent was the owner and holder of one-third of all the issued and outstanding capital stock of the San Gabriel Petroleum Company, a corporation, hereafter called San Gabriel, by which certain oil properties were held under lease. Respondent on that date sold and transferred all his San Gabriel stock to the Petroleum Midway Company, Limited, a corporation, hereafter called Midway, by a written contract, hereafter called the San Gabriel contract, which provided that Midway would acquire all of San Gabriel's assets, including its oil leases, pay all its debts, and then dissolve it. The contract further provided:

"Second party [Midway] agrees to purchase, and does hereby purchase, all of said first party's [respondent's] stockholdings in [San Gabriel], and agrees to pay therefor, at the times and in the manner hereinafter specified, one third (⅓) of the net profits received by it, its successors or assigns, from the development and operation of the properties described and enumerated in the leases, contracts and agreements now owned by [San Gabriel], for and during the full, unexpired term or terms of said leases, con-

tracts and agreements, and each of them.
. . .

"And it is further understood and agreed, by and between the parties hereto, that the net profits received by second party from the development and operation of said leasehold interests and properties shall be ascertained and determined quarterly, for quarters ending respectively on March 31, June 30th, September 30th, and December 31st, of each year, and in ascertaining and determining same, there shall be deducted from the gross receipts, in addition to other deductions, a sum of money equal to six (6%) per cent. per annum, figured on the net advances made by second party for the payment of the debts of [San Gabriel] and for the development of its properties, and when the net profits have so been ascertained, one-third (⅓) thereof shall be paid over to first party within Twenty (20) days next succeeding the end of each quarter."

The right to receive one-third of the net profits from the development and operation of the leased properties therein referred to, was the only right which the contract vested or purported to vest in respondent.

In accordance with the contract, Midway acquired all of San Gabriel's assets, including its oil leases, paid all its debts, and then dissolved it. Thereafter Midway developed and operated the oil properties covered by the leases and paid respondent one-third of its net profits therefrom, from the date of the contract to August 4, 1926. Payments so made to respondent in 1925 were $50,270.02, and in 1926 were $12,842.48. For each of those years respondent claimed an allowance for depletion. His claim was rejected by the Commissioner, but was sustained by the Board.

Respondent was married in December, 1925. Desiring to provide a separate private income for his wife and to make suitable provision for her maintenance and support, respondent in March, 1926, told her that he would give her his interest, income, or rights under the San Gabriel contract. He does not remember the exact words he used, but his purpose was to make her an irrevocable gift.

On August 4, 1926, respondent wrote and delivered to Midway a letter reading as follows:

"Please be advised that the income accruing to me in connection with the San Gabriel [contract] has been transferred as of March 31, 1926, to Mrs. Thos. A. O'Don-nell [respondent's wife], to whom you will make all future payments."

Thereafter respondent exercised no control over the San Gabriel contract and received no payments thereunder. All payments subsequently accruing under the contract were made to respondent's wife. Payments so made to her in 1926, 1927, 1928, and 1929 were in the respective amounts of $15,535.85, $27,069.99, $21,451.24, and $4,080.95. These sums were received by her agent, C. H. Norton, who deposited them in a bank to her credit. She had the exclusive use, ownership, and control of this money, used it for her own purposes and, in separate returns filed by her, reported it for taxation as her separate income. The Commissioner ruled that the money so paid to respondent's wife was taxable income of respondent. The Board reversed that ruling.

█ The Commissioner filed, with his petition for review, fifteen assignments of error. Eight of the assigned errors (assignments 2, 3, 4, 6, 7, 8, 10, and 12) are not specified in the Commissioner's brief, as required by our rule 24, and are therefore disregarded. Mutual Life Ins. Co. v. Wells Fargo Bank & Union Trust Co. (C.C.A. 9) 86 F.(2d) 585, 587; Hultman v. Tevis (C.C.A. 9), 82 F.(2d) 940, 941.

The remaining assignments raised two questions: (1) Whether respondent was entitled to a depletion allowance for 1925 and 1926, and (2) whether the payments made to respondent's wife in 1926, 1927, 1928, and 1929 constituted taxable income of respondent.

Section 214(a) of the Revenue Act of 1924, 43 Stat. 269, 270, provides:

"In computing net income there shall be allowed as deductions:

. . . . . .

"(9) In the case of mines, oil and gas wells, . . . a reasonable allowance for depletion . . ., according to the peculiar conditions in each case; such reasonable allowance in all cases to be made under rules and regulations to be prescribed by the Commissioner, with the approval of the Secretary. In the case of leases the deduction allowed by this paragraph shall be equitably apportioned between the lessor and lessee."

Similar provisions are found in section 214(a)(9) of the Revenue Act of 1926, 44 Stat. 26, 27.

█ The Commissioner concedes that, if in 1925 and 1926, before making the gift to his

wife, respondent had an economic interest in the oil in place in the leased properties mentioned in the San Gabriel contract, he was entitled to a depletion allowance under section 214(a) of the Revenue Acts of 1924 and 1926, but contends that respondent had no such interest and was, therefore, not entitled to a depletion allowance for those years. This contention must be rejected. One who is entitled, as respondent was, to receive from the holder of an oil lease a third of the net profits from the development and operation of the oil property covered by the lease cannot be said to have no economic interest in the oil in place in such leased property. Commissioner v. Elliott Petroleum Corp. (C.C.A. 9) 82 F.(2d) 193, 194, and cases there cited. See, also, Obispo Oil Co. v. Welch (C.C.A. 9) 85 F.(2d) 860, reversed on other grounds in 57 S.Ct. 684, 81 L.Ed. ——; Bankline Oil Co. v. Commissioner (C.C.A. 9, 1937) 90 F.(2d) 899.

As to the second question, the Commissioner concedes that respondent intended to and did make his wife an irrevocable gift of all income accruing to him under the San Gabriel contract after August 4, 1926, but challenges the Board's finding that respondent intended to give his wife his entire interest in the contract. The Board's finding is amply supported by the evidence. Respondent testified:

"I had considerable conversation with [my wife]. I don't know, at this late date, what words I used. I can give you the substance. With this explanation, we hadn't been married very long, and had just gotten home and I had made out a will and brought it home and showed her a copy of it. At that time I told her I had turned over to her one of the most substantial properties I had for her personal income. That was along in March, sometime. The will was made on March 19th, 1926, and the conversation I had with my wife was to the effect that I was not only providing for her in my will, but I was turning over to her, for her personal use, a valuable income which was part of my wealth. At that time I hadn't yet written the letter to [Midway], although I had told her that I was doing that.

"In my conversation with her I referred to the agreement dated January 9; 1918, between me and [Midway], as a substantial piece of property which wholly consisted of income. I couldn't be positive just what I said, what the conversation was. The purpose of it was to assure her that I was preparing and was then turning over to her a valuable more or less permanent income.

My purpose in turning it over to her was, at that time I was considered a person of substantial wealth; Mrs. O'Donnell [respondent's wife] was not, and I thought she was entitled to a personal income in which she wouldn't have to ask me at all times for spending money or whatever she wanted to use it for.

"It was my intention that the rights which I had under this contract be transferred to Mrs. O'Donnell as her sole and separate property."

■ The only right or interest respondent ever had in or under the contract was the right to receive one-third of the net profits from the development and operation of the oil properties mentioned therein. This right, according to his testimony, he intended to give to his wife. If so, he intended to give her his entire interest in the contract. The Board's finding to that effect, being supported by substantial evidence, is conclusive on this court. Holmby Corp. v. Commissioner (C.C.A. 9) 83 F.(2d) 548, 549; Commissioner v. Bank of California (C.C.A. 9) 80 F.(2d) 389, 390; Commissioner v. Eldridge (C.C.A. 9) 79 F.(2d) 629, 630, 102 A.L.R. 500; Commissioner v. Gerard (C.C.A. 9) 75 F.(2d) 542, 544. It thus conclusively appears that respondent intended to give his wife everything he had in or under the San Gabriel contract, retaining nothing therein or thereunder for himself.

■ It is true the mere intention, or the mere expression of it to respondent's wife, was not sufficient to complete the gift. As stated in the Commissioner's brief, "something remained to be done," but that "something" was done when respondent wrote and delivered to Midway his letter of August 4, 1926, directing that all subsequent payments under the contract be made to his wife. The Board's opinion correctly states:

"Petitioner [respondent here] gave his wife the means of obtaining possession and control of the thing given in the only manner possible, by informing [Midway] that he had transferred the income accruing to him under said contract to his wife, and directing [Midway] to make all future payments to her. . . .

"When the petitioner gave [Midway] the letter informing it that all of petitioner's rights were assigned to his wife and directed it to make all future payments to his wife, he made a delivery of the corpus of the gift to her; he gave her the means of obtaining possession and control of the gift, and the gift was thereby completed. . . ."

910

Respondent having transferred to his wife his entire interest in the property—the San Gabriel contract—which produced the income here involved, all income subsequently arising therefrom was taxable, not to him, but to his wife. Blair v. Commissioner, 300 U.S. 5, 12, 57 S.Ct. 330, 81 L.Ed. ——; Hall v. Burnet, 60 App.D.C. 332, 54 F.(2d) 443, 444, 83 A.L.R. 86; Helvering v. Seatree, 63 App.D.C. 274, 72 F.(2d) 67, 68; Commissioner v. Field (C.C.A. 2) 42 F.(2d) 820, 822; Lowery v. Helvering (C.C.A. 2) 70 F.(2d) 713, 714; Copland v. Commissioner (C.C.A. 7) 41 F.(2d) 501, 504.

Cases cited by the Commissioner are readily distinguishable. In Lucas v. Earl, 281 U.S. 111, 50 S.Ct. 241, 74 L.Ed. 731, the taxpayer, an attorney at law, had made an agreement with his wife whereby his future earnings were to be received and owned by them jointly. Daugherty v. Commissioner (C.C.A. 9) 63 F.(2d) 77, involved a similar agreement. In Corliss v. Bowers, 281 U.S. 376, 50 S.Ct. 336, 74 L.Ed. 916, the taxpayer had transferred a fund to trustees, in trust, to pay the income to his wife, but had reserved to himself power to alter or abolish the trust at will. In Burnet v. Leininger, 285 U.S. 136, 52 S.Ct. 345, 76 L.Ed. 665, the taxpayer, a member of a partnership, had assigned future partnership income to his wife. The partnership continued as before, the respondent being a member, the wife not. In Ward v. Commissioner (C.C.A. 9) 58 F.(2d) 757, the taxpayer, being the holder of a 99-year lease, sublet the leased property and assigned to his wife the rentals payable to him by his sublessees, but did not assign the lease itself or all his rights thereunder. These cases, therefore, are not in point.

Decision affirmed.